IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NORMAN J. EMANUEL d/b/a
EMANUEL TIRE COMPANY, *et al.*,

    *Plaintiffs*,

    v.

ACE AMERICAN INSURANCE
COMPANY,

    *Defendant*.

Civil Action No. ELH-11-875

**MEMORANDUM OPINION**

This is a declaratory judgment action rooted in a dispute between Norman J. Emanuel

d/b/a Emanuel Tire Company; Emanuel Tire Collection of Maryland, LLC; Emanuel Tire

Management Company of Maryland, LLC; Emanuel Tire of Pennsylvania, Inc.; Emanuel Tire

Transportation, LLC; and Emanuel Tire Wholesale of Maryland, LLC (collectively, the

"Emanuels"), plaintiffs, and their liability insurer, Ace American Insurance Company ("Ace" or

"Insurer"), defendant, regarding interpretation of the "Commercial General Liability" insurance

policy (the "Policy") that Ace issued to the Emanuels.  The dispute stems from Ace's refusal to

defend and indemnify the Emanuels in four lawsuits arising out of a fatal motor vehicle accident

that occurred in Florida in 2007.

On August 9, 2007, K.S.H., D.A.D., and Myrna Felicia Williams perished in a single-

vehicle accident on northbound Interstate 75 in Alachua County, Florida.  *See* Complaint ¶¶ 7, 9

(ECF 2).  The other four occupants of the vehicle, Vanessa E. Harrison, Gregory Harrison, K.H.,

and D.D., sustained serious physical injuries in the accident.[1]  *Id.* ¶ 9.  The accident spawned

four tort suits against nineteen defendants (collectively, the "Tort Actions"), filed by the

---

[1] The full names of the minor victims have been redacted.  *See* Fed. R. Civ. P. 5.2(a).

surviving occupants and the estates and survivors of the decedents (collectively, the "Tort Plaintiffs"), all alleging that the accident resulted from the sudden tread separation of the right rear tire of the vehicle. *Id.* ¶¶ 8, 9. According to the Tort Plaintiffs, the defendants were allegedly involved in the design, manufacture, inspection, sale, and/or installation of the defective tire. *Id.* Three of the tort suits are pending in the Circuit Court for Baltimore City, Maryland (collectively, the "Maryland Suits"), and the other is pending in the Circuit Court of the Eighth Judicial Circuit, in and for Alachua County, Florida (the "Florida Suit"). *Id.* ¶ 8.

The Emanuels, plaintiffs in this declaratory judgment action, are among the defendants in the Tort Actions, and they submitted a claim to Ace for a defense and coverage. Complaint ¶ 10. After Ace denied coverage, *id.* ¶ 11, the Emanuels initiated this suit, seeking a declaratory judgment that they are entitled, under the terms of the Policy, to a defense and coverage. The Emanuels also seek an award of damages as compensation for legal fees and litigation expenses incurred in defending the Tort Actions and in prosecuting this suit.[2]

Now pending before the Court is Ace's Motion to Dismiss ("Motion," ECF 9), filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Ace contends that, as a matter of law, the Policy does not require it to defend the Emanuels in the Tort Actions, because the Tort Actions present claims against the Emanuels for injuries arising from the retail sale of a

---

[2] The declaratory action was filed in the Circuit Court for Baltimore City. On April 4, 2011, Ace removed the case from state court on the ground of diversity of citizenship (ECF 1). *See* 28 U.S.C. §§ 1332(a) (original jurisdiction on basis of diversity of citizenship); 1441(a)-(b) (removal jurisdiction). It appears that the parties are diverse for purposes of subject matter jurisdiction. *See* ECF 2, 24, 25, 26. In addition, the amount in controversy exceeds the jurisdictional threshold amount of $75,000, because each of the Maryland Suits seeks damages of $50 million (the Florida Suit does not allege a specific amount of damages), and the Emanuels are insured under the Policy for liability coverage up to $2 million, to which must be added the cost of a defense of the Emanuels by Ace in the Tort Actions. *See, e.g.*, *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977) ("In actions seeking declaratory . . . relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."); *accord JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 639 (4th Cir. 2010).

used tire, and the Policy specifically excludes from coverage the retail sale of used tires.[3]   The

Motion has been fully briefed,[4] and no hearing is necessary.   *See* Local Rule 105.6.   For the

reasons that follow, I will deny Ace's Motion.

## Background

In considering a motion to dismiss under Rule 12(b)(6), a court "'must accept as true all

of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences

[from those facts] in favor of the plaintiff.'"   *E.I. du Pont de Nemours & Co. v. Kolon Indus.,*

*Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)).   In

---

[3]   Arguably, defendant should have filed an answer and a motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, rather than a motion to dismiss.   In effect, Ace seeks a declaration, on the merits, that it has no duty to defend or to indemnify.

At least under Maryland law, when a complaint seeking a declaratory judgment presents a justiciable controversy, "a motion to dismiss 'is rarely appropriate.'"   *120 West Fayette St., LLLP v. Mayor of Baltimore*, 413 Md. 309, 355, 992 A.2d 459, 487 (2010) (citation and some internal quotation marks omitted).   "It is proper to dismiss a declaratory judgment action only where there is a lack of jurisdiction or where a declaratory judgment is not an available or appropriate type of remedy," *Christ by Christ v. Md. Dept. of Nat. Res.*, 335 Md. 427, 435, 644 A.2d 34, 37 (1994), such as where the dispute is moot, unripe, the parties lack standing, or there is another applicable statutory remedy.   *See 120 West Fayette St.*, 413 Md. at 356-57, 992 A.2d at 488.   Maryland's Court of Appeals has long held that the "'test of the sufficiency of the bill is not whether it shows that the plaintiff is entitled to the declaration of rights . . . in accordance with his theory, but whether he is entitled to a declaration at all.'"   *Id.* at 356, 992 A.2d at 487 (citations omitted).   In other words, "'even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree,'" and the court ordinarily should proceed to issue a declaratory judgment in favor of the party that is entitled to prevail.   *Id.* at 356, 992 A.2d at 487-88 (citations omitted).   The issue is largely academic, however, because a motion for judgment on the pleadings "is assessed under the same standard that applies to a Rule 12(b)(6) motion."   *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009); *see also Burbach Broadcasting Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002); *Nat'l Cas. Co. v. Lockheed Martin Corp.*, 415 F. Supp. 2d 596, 600 (D. Md. 2006).

[4]   The Court has considered Ace's Motion and memorandum in support (collectively, "Motion") (ECF 9-1); the Emanuels' opposition thereto ("Opp.") (ECF 17-1); Ace's reply ("Reply") (ECF 18); and the Emanuels' surreply ("Surreply") (ECF 23), filed with leave of court (ECF 22).   *See* Local Rule 105.2(a) (prohibiting surreplies without leave of court).

addition to the complaint, the court may consider a document "attached or incorporated into the complaint," as well as a document outside the complaint that is "'integral to and explicitly relied on in the complaint,'" the authenticity of which the plaintiff does not challenge. *E.I. du Pont*, 637 F.3d at 448 (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). The facts presented here are drawn from the Emanuels' complaint; the Policy (ECF 15); and the underlying complaints in the four Tort Actions (ECF 11, 12, 13 & 16), which were attached as exhibits to the Emanuels' complaint.

A.  The Tort Actions

The Tort Actions are as follows:

    (1) *Williams, et al. v. Continental Tire The Americas, LLC, et al.*, No. 24-C-10-5762 (Baltimore City Cir. Ct.) (the "Williams Suit");

    (2) *Dyer, et al. v. Continental Tire The Americas, LLC, et al.*, No. 24-C-10-5763 (Baltimore City Cir. Ct.) (the "Dyer Suit");

    (3) *Harrison, et al. v. Continental Tire The Americas, LLC, et al.*, No. 24-C-10-5764 (Baltimore City Cir. Ct.) (the "Harrison Suit"); and

    (4) *Harrison, et al. v. Continental Tire North Am., Inc., et al.*, No. 01-09-CA-4003J (Fla. Cir. Ct.) (the Florida Suit).[5]

The identities of the plaintiffs and the allegations concerning the specific injuries differ in each of the Maryland Suits, but the defendants are identical, as are the allegations lodged against them. *See* Williams Complaint (ECF 10); Dyer Complaint (ECF 11); Harrison Complaint (ECF 12). The Williams Suit concerns claims arising from the death of Myrna Felicia Williams; the Dyer Suit involves the death of D.A.D. and injuries to his sibling, D.D.; and the Harrison Suit concerns injuries to Vanessa and Gregory Harrison and their daughter K.H., and the death of their son, K.S.H.

---

[5] The applicable complaint in the Florida Suit is an "Amended Complaint." The original complaint in the Florida Suit is not contained in the record.

The Florida Suit concerns the deaths of and injuries to all of the occupants of the vehicle. The plaintiffs are the surviving occupants of the vehicle and the personal representatives of the estates of the decedents.  Unlike the Maryland Suits, no surviving relatives of the decedents are named as plaintiffs, except the relatives who were also occupants of the vehicle.[6]

As noted, the plaintiffs in this declaratory action are six of the nineteen defendants in the four Tort Actions.[7]   Three other "Emanuel" entities are among the defendants in the Tort Actions, but are not plaintiffs here: Emanuel Tire Company, LLC; Emanuel Tire Retail of Maryland, LLC; and Emanuel Tire at Hollins Ferry, LLC.  The Maryland Suits refer to all nine of the Emanuel entities (including the plaintiffs in this case) collectively, without distinction, as the "Emanuel Tire Defendants."  Similarly, in each paragraph referencing Norman J. Emanuel and the eight Emanuel businesses, the complaint in the Florida Suit reiterates the name of each of the eight "Emanuel" businesses, and does not make distinct allegations against the various "Emanuel" defendants.

In the Maryland Suits, in addition to the nine "Emanuel Tire Defendants," there are nine other defendants: Continental Tire The Americas, LLC; Continental Tire North America, Inc.; Continental General Tire, Inc.; General Tire, Inc.; Gencorp, Inc.; General Tire International Company; Valvoline Instant Oil Change Franchising, Inc.; The Valvoline Company, A Division

_____

[6] It is not entirely clear why the Tort Plaintiffs have filed suit in Florida as well as in Maryland.  The complaints suggest significant overlap as to the issues and the parties.  However, in the Maryland Suits, some of the plaintiffs were not occupants of the vehicle at the time of the accident; rather, they are relatives of the decedents, who assert wrongful death claims arising from the fatalities.  In addition, the Maryland Suits involve survival actions by the decedents' estates and personal injury suits by the survivors of the accident (some plaintiffs, who were both injured in the accident and are relatives of the decedents, assert both wrongful death and personal injury claims).  *See John Crane, Inc. v. Puller*, 169 Md. App. 1, 95, 899 A.2d 879, 932 (2006) (explaining Maryland's distinction between "wrongful death" and "survival" claims).

[7] As we shall see, there are eighteen defendants in the Maryland Suits and eighteen defendants in the Florida Suit.  The eighteen defendants are not identical, however.  As a result, there is a total of nineteen defendants in the four Tort Actions.

of Ashland, Inc.; and Valvoline Instant Oil Change, A Division of Ashland, Inc.  In the Florida

Suit, the non-Emanuel defendants are the same as those in the Maryland Suits, except that

Continental Tire The Americas, LLC is not a defendant, and J.P.A. Enterprises, LLC, a business

entity that is not a defendant in the Maryland Suits, is named as a defendant in the Florida Suit.

The specifics of the allegations against these defendants are not material to this lawsuit.[8]

According to the complaints in the Maryland Suits, "the Emanuel Tire Defendants owned

and operated a business known as Emanuel Tire Company located at 1300 Moreland Avenue, in

Baltimore City, Maryland, which sold used tires to the general public."  Williams Complaint

¶ 33.  The complaints aver, *id.* ¶¶ 45, 48-50, 75-78, 84-87:

> On or about July 30, 2007, Vanessa and Gregory Harrison, took [their]
> 2004 Chevrolet Trailblazer to the Emanuel Tire Defendants at Defendant
> Emanuel and the Emanuel Tire Defendants' Mooreland [sic] Avenue facility
> where an agent, servant, employee, and/or other representative of said Defendants
> inspected the tires on the vehicle.  The Harrisons were advised by said Defendants
> that two of the tires needed to be replaced.  Vanessa Harrison purchased two used
> tires from The Emanuel Tire Defendants including the subject Continental tire.
> The Emanuel Defendants moved the tires that were on the rear of the vehicle to
> the front and the two newly purchased used tires[,] including the subject
> Continental tire, were placed on the rear of the vehicle.  The agent, servant,
> employee, and/or other representative of the Emanuel Tire Defendants selected
> the tires to be placed on the vehicle and also made the decision to mount the two
> used tires on the rear of the vehicle.
>
> *     *     *
>
> On August 9, 2007, Vanessa E. Harrison was operating [the vehicle],
> heading in a northbound direction on Interstate 75 . . . .  Gregory V. Harrison,
> Myrna F. Williams, [K.S.H.], [K.H.], [D.A.D.], and [D.D.] were all occupants of
> the subject vehicle at the time . . . .
>
> Suddenly and without warning, the tread of the subject Continental
> Contitrac tire mounted on the right rear of the [vehicle] separated, detached, and
> suddenly and violently flew off the tire.

---

[8] In general, the theories of liability as to these other defendants are that some of them
were responsible for the faulty design and manufacture of the tire, and that others failed to notice
any defect in the tire and/or to properly inflate it during a routine oil change and inspection on
the day of the accident.

As a direct result of the tire tread separation, the [vehicle] became immediately unstable and uncontrollable, then rolled over several times . . . .

\* \* \*

## COUNT III
## . . . STRICT LIABILITY AS TO [THE EMANUEL TIRE DEFENDANTS]

\* \* \*

At all times material hereto, Defendant Emanuel and the Emanuel Tire Defendants, were engaged in the business of serving and selling tires, including the subject Continental [tire] . . . .

Defendant Emanuel and the Emanuel Tire Defendants sold the subject tire and injected said tire into the stream of commerce.

At the time of the fatal motor vehicle crash, the subject Continental . . . tire was in substantially the same condition as when it was originally sold and placed into the stream of commerce by Defendant Emanuel and the Emanuel Tire Defendants.

The subject tire was unfit and unsafe for its intended use and purposes. The tire was defectively designed, manufactured, tested, and inspected resulting in sudden and catastrophic failure during the normal service life of the tire.

\* \* \*

## COUNT IV
## . . . NEGLIGENCE AS TO [THE EMANUEL TIRE DEFENDANTS]

\* \* \*

At all times material hereto, Defendant Emanuel and the Emanuel Tire Defendants owned and operated the tire retail and service facility that installed the subject tire onto the right rear of the [vehicle].

Defendant Emanuel and the Emanuel Tire Defendants knew or in the exercise of reasonable care should have known that installing or retaining worn and used tires on the rear of the subject vehicle would greatly impair the vehicle's handling characteristics, particularly in the event of a sudden tread belt separation such as occurred in this case.

Defendant Emanuel and the Emanuel Tire Defendants owed a duty of reasonable care to users of the [vehicle] . . . .

Defendant Emanuel and the Emanuel Tire Defendants breached their duty of reasonable care . . . in the following manner:

a.    Failing to properly inspect the subject tire and determine its suitability for use by an operator of the subject [vehicle];

b.    Failing to properly inspect the tire for impending tread belt separations;

c.    Installing worn or used tires on the subject Vehicle;

d.    Installing or retaining worn and used tires on the rear of the subject vehicle when it knew, or should have known that this would adversely impact the handling of the vehicle . . . ;

e.    Failing to warn potential users . . . ;

*    *    *

g.    Negligently transferring the subject tire with defects to Emanuel Tire Retail for sale;

h.    Negligently inspecting, grading, culling, and selecting the subject tire from used tires as fit sales to the general public; and

i.    Otherwise failing to act reasonably and prudently under the circumstances.

Although the factual allegations in the Florida Suit and in the Maryland Suits are largely the same, there are two notable differences.  First, in contrast to the Maryland Suits, the Florida Suit does not allege that the Emanuel businesses "transferr[ed] the subject tire with defects to Emanuel Tire Retail for sale."  Nor does it claim that the Emanuel businesses "inspect[ed], grad[ed], cull[ed], and select[ed] the subject tire from used tires as fit sales to the general public."  Second, the Florida Suit alleges at length that the various "Emanuel" business entities are all "merely shell corporations" operated by Norman J. Emanuel.  For example, the Florida complaint avers that, "[d]espite their deceptive and misleading names, [the "Emanuel" businesses] are not legitimate business enterprises," Florida Complaint ¶ 21, and that the "Emanuel" businesses "do not, and at all relevant times mentioned herein, did not exist.  Instead the unincorporated entity Emanuel Tire Company and [Norman J.] Emanuel was the real business." *Id.* ¶ 23.

B.  The Policy

The Emanuels contend that, under the terms of the Policy, the Insurer is obligated to defend and indemnify them in the Tort Actions.  The Policy consists of 88 pages with various captions, including "Form," "Declaration," "Endorsement," and "Exclusion."

According to the "Declarations," dated March 7, 2007, the named insureds are listed as "Emanuel Tire Company" and "Norman Emanuel t/a Emanuel Tire Company."  Policy at 3.  On a subsequent page of the Declarations, the "complete description of the Named Insured" contains several other Emanuel business entities, including Emanuel Tire of Pennsylvania, Inc.  A later "Declarations Update Endorsement," dated October 17, 2007, adds several Emanuel businesses as named insureds, including Emanuel Tire Collection of Maryland, LLC; Emanuel Tire Management Company of Maryland, LLC; Emanuel Tire Transportation, LLC; and Emanuel Tire Wholesale of Maryland, LLC.  Thus, all of the plaintiffs in the case *sub judice* are insured under the Policy.[9]

The core of the Policy is a 15-page document entitled "Commercial General Liability Coverage Form" ("CGL Form").[10]  *See* Policy at 21-35.  The CGL Form describes three

---

[9] Emanuel Tire Retail of Maryland, LLC and Emanuel Tire at Hollins Ferry, LLC, which are defendants in the Tort Actions but not plaintiffs in this case, are not named insureds under the Policy.  The third Emanuel entity that is a defendant in the Tort Actions but not a plaintiff in this case is Emanuel Tire Company, LLC.  Although "Emanuel Tire Company" is listed as a named insured, there is no "LLC" designation in the listing.

[10] The CGL Form, denominated "CG 00 01 12 04," is a standard form developed by Insurance Services Office, Inc., an organization that provides risk management and policy development services to the insurance industry.  The standard CGL Form is used by many commercial liability insurers throughout the United States.  *See* 2 New Appleman Law of Liability Insurance, § 9.03[1] (2d ed. 2011).  *See also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993) ("Insurance Services Office, Inc. (ISO), an association of approximately 1,400 domestic property and casualty insurers . . . , is the almost exclusive source of support services in this country for CGL insurance.  ISO develops standard policy forms and files or lodges them with each State's insurance regulators; most CGL insurance written in the United States is written on these forms.") (internal citations omitted); *French v. Assurance Co.*,

"coverages": Coverage A, "Bodily Injury and Property Damage Liability"; Coverage B, "Personal and Advertising Injury Liability"; and Coverage C, "Medical Payments." Coverage A is relevant here. In the section of the CGL Form describing Coverage A, which refers to Ace as "we," the CGL Form provides, *id.* § I.A.1.a:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

The provision of the Policy that is primarily in dispute is an endorsement entitled "Exclusion – Designated Ongoing Operations" (the "Endorsement").[11]  Policy at 2. It states, *id.*:

SCHEDULE

Description of Designated Ongoing Operation(s):

*ANY AND ALL OPERATIONS THAT CONSIST OF RETAIL USED TIRES TO INCLUDE PERSONAL INJURY AND MEDICAL PAYMENTS*

\*   \*   \*

The following exclusion is added to paragraph 2., Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages)

This insurance does not apply to "bodily injury" or "property damage" arising out of the ongoing operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

The Policy does not define the terms "operations," "ongoing operations," or "retail."

Several other provisions of the Policy are also relevant. The CGL Form states that the "Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for

---

448 F.3d 693, 695 (4th Cir. 2006) (interpreting "standard . . . commercial general liability policy form published by the Insurance Services Office").

[11]  The Endorsement is also a form developed by the Insurance Services Office, designated "CG 21 53 01 96." I have indicated using italics the portion of the Endorsement that is not form language.

damages because of 'bodily injury' and 'property damage' included in the 'products-completed operations hazard.'" *Id.* at 10. Page 7 of the Policy sets forth the "Liability Coverages," which include a "Products/Completed Operations Aggregate" limit of $2 million. The Policy defines the "products-completed operations hazard" to include, with exceptions not relevant here, "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'" CGL Form at 14. In turn, "your product" includes "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the insured, and "your work" includes "[w]ork or operations performed by you or on your behalf," as well as "[m]aterials, parts or equipment furnished in connection with such work or operations." *Id.* at 15.

Additional facts will be included in the discussion.

## Standard of Review

"'The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted). As noted, "[i]n deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint" or that are "'integral to and explicitly relied on in the complaint' [where] there [is] no authenticity challenge." *E.I. du Pont*, *supra*, 637 F.3d at 448 (quoting *Phillips*, *supra*, 190 F.3d at 618).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then

determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to relief. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011). Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief.'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted).

The parties' disputes of fact ordinarily "cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6)," *Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009), because the court must construe the well-pled facts "in the light most favorable to the nonmoving party." *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011). However, the complaint's "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . 'unwarranted inferences, unreasonable conclusions, or arguments'" all "fail to constitute well-pled facts for Rule 12(b)(6) purposes," and thus the court need not assume that they are true. *Nemet Chevrolet*, *supra*, 591 F.3d at 255 (citing *Iqbal*, 129 S. Ct. at 1949, and *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n.26 (4th Cir. 2009)).

### Discussion

In the federal courts, declaratory judgments are authorized by the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), which provides (with exceptions not relevant here) that, in "a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." Because the parties' rights and obligations in this case arise under the Policy, resolution of Ace's Motion turns on interpretation of the Policy. Both sides rely upon Maryland law.[12]

---

[12] In exercising diversity jurisdiction, a federal court "must apply the substantive law of the forum state including its choice of law rules." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507

Maryland law is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts." *Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900 A.2d 208, 225-26 (2006); *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305, 753 A.2d 533, 537 (2000).   Accordingly, "'ordinary principles of contract interpretation apply.'"   *Megonnell v. United Servs. Automobile Ass'n*, 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation omitted); *see Dutta v. State Farm Ins. Co.,* 363 Md. 540, 556, 769 A.2d 948, 957 (2001).   "In order to determine the intention of the parties to an insurance contract, the instrument must be construed as a whole and 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' must be examined."   *United Services Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 784 (1995)).

However, the court bears responsibility for ascertaining the scope and limitations of an insurance policy.   *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001); *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co., Inc.*, 324 Md. 44, 56, 595 A.2d 469,

---

F.3d 270, 275 (4th Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941), and *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)).   Maryland is the forum state. When an insurance policy, like the Policy at issue, contains no choice of law provision, Maryland applies the doctrine of *lex loci contractus*, under which "'the law of the jurisdiction where the contract was made controls its validity and construction.'"   *U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 463, 18 A.3d 110, 116 (2011).   Moreover, the "'*locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid.'"   *Id.* (citation omitted).   In this case, that state is apparently Maryland; Emanuel Tire Company's office, to which the Policy was addressed, is located in Maryland.   *See* Policy at 1.   *See also Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Univ.*, 489 U.S. 468, 474 (1989) ("interpretation of private contracts is ordinarily a question of state law"); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004); *see also French*, *supra*, 448 F.3d at 700 (stating, in diversity declaratory action regarding coverage under insurance policy issued in Maryland, "we apply . . . Maryland's substantive law regarding the interpretation of an insurance policy").

475 (1991).  In "'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'"  *Universal Underwriters Ins. Co. v. Lowe*, 135 Md. App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021 (1993)).

The Maryland Court of Appeals has explained that judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties."  *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003).  Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean."  *Universal Underwriters Ins. Co.*, 135 Md. App. at 137, 761 A.2d at 1005; *see Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14-15, 852 A.2d 98, 106 (2004); *Litz v. State Farm*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997).  However, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding.  *Valliere v. Allstate Insurance Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991)  ("When a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Walk*, 382 Md. at 14-15, 852 A.2d at 106; *Dutta*, 363 Md. at 556, 769 A.2d at 957.

If the court deems the provisions of an insurance policy unambiguous, the meaning of the terms is determined by the court as a matter of law.  *Cole*, 359 Md. at 305, 753 A.2d at 537.  In that circumstance, "'a court has no alternative but to enforce those terms.'"  *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta,* 363 Md. at 557, 556 A.2d at 1138).  But, if a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning.  *Cole,* 359

Md. at 305, 753 A.2d at 537.  A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning."  *Id.* at 306, 753 A.2d at 537.  The treatise, G.J. Couch, 2 COUCH CYCLOPEDIA OF INSURANCE LAW (2d ed. 1959), on which the Maryland appellate courts have relied, states: "The criterion is ambiguity from the standpoint of a layman, not from that of a lawyer." *Id.*, § 15:84, at 416-418.

"'Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 771 (citation omitted); *see Bushey v. Nothern Assurance Co. of America*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992). But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459-60, 889 A.2d 387, 394 (2006).  *See Callaway*, 375 Md. at 280, 825 A.2d 995, 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer.").

Regarding the insurer's duty to defend, what the Maryland Court of Appeals stated in *Aetna Casualty & Surety Co. v. Cochran*, 337 Md. 98, 102-03, 651 A.2d 859, 861 (1995) (citation omitted), is pertinent:

> In *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975), this Court held that an insurance company has a duty to defend its insured for all claims which are potentially covered under an insurance policy.  In *Brohawn* we stated:
>
> > The obligation of an insurer to defend its insured under a contract provision ... is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the

> policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy."

In the context of an insurer's duty to defend its insured in a tort case, the Maryland Court of Appeals articulated a two-part test in *St. Paul Fire & Marine Ins. v. Pryseski*, 292 Md. 187, 193, 438 A.2d 282, 285 (1981):

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

*See also Moscarillo v. Professional Risk Management Services, Inc.*, 398 Md. 529, 538, 921 A.2d 245, 250 (2007); *Walk*, 382 Md. at 15, 852 A.2d at 106; *Cochran*, 337 Md. at 103-04, 651 A.2d at 862.

When the complaint in the underlying action "neither conclusively establishes nor negates a potentiality of coverage," an insured is entitled to rely on extrinsic evidence to establish a potentiality of coverage. *Cochran*, 337 Md. at 108, 651 A.2d at 864; *see Moscarillo*, 398 Md. at 541, 921 A.2d at 252 ("[T]o establish a potentiality of coverage, an insured can also refer to extrinsic evidence."); *Walk*, 382 Md. at 16, 852 A.2d at 106-07. But, "'[o]nly if an insured demonstrates that there is a reasonable potential that the issue triggering coverage will be generated at trial can evidence to support the insured's assertion be used to establish a potentiality of coverage under an insurance policy.'" *Moscarillo*, 398 Md. at 541, 921 A.2d at 252 (quoting *Cochran*, 337 Md. at 112, 651 A.2d at 866). The *Walk* Court affirmed that "'extrinsic evidence must . . . relate in some manner to a cause of action *actually alleged* in the complaint and cannot be used by the insured to create a new, unasserted claim that would create

a duty to defend.'" 382 Md. at 21, 852 A.2d at 110 (quoting *Reames v. State Farm Fire and Casualty Insurance*, 111 Md. App. 546, 561, 683 A.2d 179, 186 (1996)) (emphasis in *Walk*).

Thus, in determining whether an insurer is obligated to defend a suit against an insured, there are two ways in which extrinsic evidence may be relevant.  First, extrinsic evidence may be relevant to resolve an ambiguity in the language of the insurance policy regarding what types of claims are within the scope of coverage.  Second, extrinsic evidence may be offered by the insured (but not by the insurer, *see, e.g.*, *Cochran*, 337 Md. at 107, 651 A.2d at 863) to demonstrate that the claims alleged in the complaint against the insured in the underlying lawsuit come within the coverage of the policy.

In this case, the parties' dispute turns on the Endorsement to the Policy, which excludes from liability coverage certain "ongoing operations," defined as "any and all operations that consist of retail used tires to include personal injury and medical payments."  At least for purposes of Ace's Motion, the parties agree that Ace is obligated to provide plaintiffs with a defense in the Tort Actions under Coverage A of the Policy unless, due to the Endorsement, there is no potentiality of coverage.  Put another way, at this juncture, the only argument for dismissal that Ace has advanced is based upon the Endorsement.  Specifically, Ace contends that because the automobile accident at issue in the Tort Actions was caused by a "retail used tire," the Endorsement precludes coverage.[13]

As Ace sees it, the Endorsement is "unambiguous."  Motion at 5.  In its view, the Endorsement plainly provides that there is no coverage under the Policy "for bodily injury arising out of that portion of [plaintiffs'] business operations having anything whatsoever to do with used tires in a retail setting—irrespective of whether the allegation as to that used tire is as to its design, manufacture, testing, inspection, sale, installation or failure to warn."  *Id.*  Ace

---

[13] The parties do not dispute that the alleged defective tire was, indeed, a used tire.

relies upon an unreported Fourth Circuit opinion, *Beretta U.S.A. Corp. v. Federal Ins. Co.*, 17 F. App'x 250 (4th Cir. 2001), for the proposition that the phrase "arising out of," in the context of an insurance policy exclusion, should be construed broadly.

In response, plaintiffs advance two primary arguments.  First, plaintiffs assert: "Both the Florida and Maryland Lawsuits assert claims against Plaintiffs for negligent inspection of the subject tire."  Opp. at 6.  Indeed, as plaintiffs note, all three of the Maryland Suits (although not the Florida Suit) contain express allegations that plaintiffs negligently transferred the tire with defects to Emanuel Tire Retail for sale, and negligently inspected, graded, culled, and selected the tire from other used tires as fit for sale to the public.  According to plaintiffs, these claims allege liability for *wholesale* operations.  In their complaint, the Emanuel plaintiffs aver that they "do not perform any operations that consist of 'retail used tires.'"  Complaint ¶ 20.  In their view, the "retail used tires" Endorsement applies only to retail operations, not wholesale operations.[14] They argue, Opp. at 6-7:

> Clearly, there is a "potentiality" for coverage under the ACE Insurance Policy because a trier of fact [in the Tort Actions] could find the following:
>
> 1.    The subject tire was installed and sold by Emanuel Tire Retail of Maryland, LLC [, which is a defendant in the Tort Actions, but is not a plaintiff in this case].

---

[14] Ace contends that plaintiffs' claim that they do not perform any operations consisting of "retail used tires" is false.  It submitted with its Reply various web page listings that it contends demonstrate that "Emanuel Tire Company" sells used tires at retail.  *See* Ex. 1 & 2 to Reply (ECF 18-1 & 18-2).  However, for purposes of Ace's Motion, I must accept as true the well pleaded facts of plaintiffs' complaint, and cannot consider Ace's exhibits.

Pursuant to Fed. R. Civ. P. 12(d), the Court has discretion, upon notice to the parties, to convert a motion to dismiss into a motion for summary judgment, so as to permit consideration of "matters outside the pleadings."  However, I decline to exercise that discretion here.  Among other reasons, Rule 12(d) requires that "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Submission of material outside of the pleadings, appended to a reply, clearly hampers the non-moving party's ability to respond.

2.    The Plaintiffs did not sell or install the subject tire and do not perform any operations that consist of retail used tires.

3.    That one or more of the Plaintiffs is engaged in the business of selling and/or providing used tires on a wholesale basis to used tire dealers within and throughout the United States, including Emanuel Tire Retail.

4.    That one or more of the Plaintiffs was negligent in "failing to inspect the tire for impending tread belt separations," or negligently "inspecting, grading, culling and selecting the subject tire as fit sales to the general public" and/or "negligently transferring the subject tire with defects to Emanuel Tire Retail for sale" or "otherwise failing to act reasonably and prudently under the circumstances.

Second, focusing on the language of the Endorsement referring to "ongoing operations," plaintiffs distinguish "ongoing operations" from "products-completed operations," and point out that the Policy expressly provides coverage (up to $2 million) for liability that falls within the "Products/Completed Operations Hazard."  In their view, the "language of the Endorsement is not nearly as broad as ACE says it is."  Opp. at 7.  Plaintiffs posit that, by only excluding "ongoing operations" that consist of "retail used tires," the Endorsement does not affect coverage for "products-completed operations."  They maintain that they are entitled to coverage because the allegations fall within the scope of "products-completed operations."

The Emanuels explain that "commercial general liability insurance traditionally distinguishes between 'operations' risks and 'completed operations.'"  *Id.* at 8.  For support, they quote the following discussion from 3 NEW APPLEMAN ON INSURANCE, LAW LIBRARY EDITION, § 16.02[3][a][ii] (footnotes omitted):

"Operations" (or "premises" or "premises-operations") risks occur while the insured's normal business operations are taking place.  By contrast, "completed operations" risks occur after the insured's work has been completed.  Those risks have different actuarial bases and are sometimes excluded from (or, added to) policies.  Where the insured is a manufacturer, distributor, or seller, the analog of the "completed operations" risk is the "product hazard," which refers to the risk that a product handled by the insured will cause an injury after it has left the

insured's control.  General liability policies consider these two similar risks as a single one, called the "products/completed operations hazard."

Another APPLEMAN treatise, 3 NEW APPLEMAN LAW OF LIABILITY INSURANCE, § 16.02[2][a] (2d ed. 2011), states that "CGL insurers typically charge a separate premium to insure products-completed operations losses, and many CGL policies are issued with endorsements that expressly exclude products-completed operations coverage."  The treatise provides an example of such an endorsement: "'This insurance does not apply to 'bodily injury' or 'property damage' included within the "products-completed operations hazard.'"  *Id.* Coverage A of the Policy in this case does not contain such an exclusion.  Rather, as plaintiffs observe, it expressly includes coverage for "products-completed operations" liability.

Thus, plaintiffs insist that liability for bodily injury arising from their products, such as used tires, after the products have left their premises, falls under the "products-completed operations" coverage.   They cite decisions of several courts in states other than Maryland, which they contend have differentiated between "ongoing" and "completed" operations.  *See One Beacon Ins. v. Travelers Prop. Cas. Co.*, 856 N.Y.S.2d 737 (N.Y. App. Div. 2008); *Perez v. New York City Hous. Auth.*, 754 N.Y.S.2d 635 (N.Y. App. Div. 2003); *Fleniken v. Entergy Corp.*, 790 So.2d 64 (La. App. 2001).

Even if the Policy does not unambiguously provide plaintiffs with coverage, plaintiffs argue that it is at least ambiguous, and therefore they are entitled to present extrinsic evidence bearing on the question of coverage.  Moreover, they rely upon the Maryland case law, reviewed earlier, providing that, if an insurance policy remains ambiguous after consultation of extrinsic evidence, it will ordinarily be construed against the drafter, *i.e.*, the insurer.  *See, e.g.*, *Clendenin Bros.*, *supra*, 390 Md. at 459, 889 A.2d at 394.

In response, the Insurer asserts that it is "irrelevant" that plaintiffs allegedly do not sell used tires at retail.  Reply at 2.  It suggests that if, in fact, plaintiffs are not used tire retailers, they will "have no liability" in the Tort Actions, Motion at 7, but that they still are not entitled to a defense from Ace because the Tort Actions' allegations, regardless of whether they are true or false, allege liability that is excluded from coverage under the Policy.  Put another way, Ace maintains that, even if plaintiffs only engage in wholesale used tire sales, their alleged liability still "arises out of" the failure of a used tire that was sold at retail, and therefore coverage is excluded by the Endorsement.

Ace also rejects plaintiffs' distinction between "ongoing operations" and "completed operations."  In Ace's view, unless the Endorsement "specifically expresses the intent not to subject the completed operations coverage to the [Endorsement]," which it does not do, "there is no inherent ambiguity or tension between these two provisions."  Reply at 5.  Ace asserts that the Policy's "products-completed operations aggregate limit" is not "coverage separate from the commercial general liability coverage."  *Id.* at 4.  Rather, the Insurer argues that the aggregate limit merely delineates the Policy's scope of coverage.  Quoting another unreported Fourth Circuit case, *Auto-Owners Ins. Co. v. Potter*, 105 F. App'x 484, 487-88 (4th Cir. 2004), which concerned a pollution exclusion, Ace claims that inclusion of the "products-completed operations" aggregate limit makes "'clear that insurance coverage continues to apply to work that has been completed.'"  Reply at 4.  Thus, according to Ace, the Endorsement applies, by its plain terms, to all categories of general liability coverage, in contrast to other exclusions in the Policy that "clearly express the intent to limit their applicability."[15]  *Id.* at 5.

---

[15] Ace does not expressly identify the other exclusions to which it refers.

At this juncture, I cannot conclude, solely on the basis of the pleadings and the language of the Policy, that the Policy unambiguously precludes any potentiality of coverage for the Emanuels in the Tort Actions.  Therefore, I shall deny Ace's Motion.  My reasons follow.

Preliminarily, it is clear that the Tort Actions, or at least the Maryland Suits, state claims against the Emanuels that could, if proven, subject the Emanuels to liability solely on the basis of a wholesale sale of the defective used tire at issue.  As discussed, the complaints in the Maryland Suits charge that the Emanuels "transferr[ed] the subject tire with defects to Emanuel Tire Retail for sale."   This allegation appears to contemplate a wholesaler-retailer or supplier-retailer relationship.[16]   In this respect, it bears repeating that Emanuel Tire Retail of Maryland, LLC, the entity that the Tort Plaintiffs suggest was the actual retailer of the defective used tire, is neither a plaintiff in this declaratory suit nor an insured under the Policy.

Moreover, for purposes of Ace's Motion, I must accept as true the Emanuels' allegations in their declaratory complaint that they "do not perform any operations that consist of 'retail used tires.'"  Complaint ¶ 20.  Therefore, I shall assume that the Emanuels deal only in wholesale used tires, not retail used tires.  I must decide whether the plain language of the Endorsement nonetheless unambiguously precludes the potentiality of coverage.  In my view, it does not.

_____

[16] The Florida Suit does not contain the same express allegation, although it does assert that the Emanuels "injected [the] tire into the stream of commerce," Florida Complaint ¶ 72, and failed "to properly inspect the tire for impending tread belt separations," *id.* ¶ 83, for which a wholesaler could just as easily be liable as a retailer.  In any event, no party has suggested that, in the present posture, I should consider whether the Emanuels might be entitled to a defense in some, but not all, of the Tort Actions.  Nor has any party suggested that I should consider whether some, but not all, of the Emanuels might be entitled to coverage (for instance, because only some of the Emanuels are wholesalers), or whether, as the Florida Complaint alleges, the various Emanuel businesses are actually a single, unified enterprise.  Because the complaints in the Tort Actions largely fail to differentiate among the various Emanuel entities, it is impossible to make such a determination solely on the basis of the pleadings.  This illustrates one reason why it is sometimes necessary for an insured to rely on extrinsic evidence to show the insurer's duty to defend.  As the Maryland Court of Appeals observed in *Litz, supra*, 346 Md. at 226, 695 A.2d at 570, the insured otherwise would be "completely at the mercy of the tort plaintiff's pleadings to establish a potentiality of coverage."

Resolution of the parties' dispute turns on the language of the Endorsement. As noted, it states: "This insurance does not apply to 'bodily injury' or 'property damage' arising out of the ongoing operations described in the Schedule of this endorsement." In turn, the "Designated Ongoing Operations" are defined as "any and all operations that consist of retail used tires to include personal injury and medical payments." The interplay of the phrases "arising out of," "ongoing operations," and "retail used tires" is central.

Ace relies upon the broad construction that Maryland courts have placed upon the phrase "arising out of" in other cases regarding insurance coverage. In *Beretta*, *supra*, 17 F. App'x 250, the Fourth Circuit considered a claim by a firearms manufacturer to entitlement to a defense from its insurers against several lawsuits alleging "'negligent marketing and distribution of guns and public nuisance.'" *Id.* at 252 (quoting underlying claims). Applying Maryland law to interpret the insurance policy, the Court held that the manufacturer was not entitled to a defense, due to an exclusion contained in the policy.

The exclusion at issue provided that the manufacturer was not insured against any claim that fell within the "products/completed-operations hazard," which was defined to include, with some exceptions, "'all bodily injury and property damage occurring away from premises you own or rent and *arising out of* your product.'" *Id.* (quoting policy; emphasis added).[17] After reviewing decisions of the Maryland Court of Appeals, including *Mass Transit Administration v. CSX Transportation, Inc.*, 349 Md. 299, 708 A.2d 298 (1998), and *North Insurance Co. v. EDP Floors, Inc.*, 311 Md. 217, 533 A.2d 682 (1987), the Beretta Court stated: "Maryland courts have interpreted broadly the policy phrase 'arising out of.' . . . In other words, the phrase 'arising out of' implies only 'but for' causation." *Beretta*, 17 F. App'x at 253 (citations omitted). The

---

[17] The definition of the "products-completed operations" hazard in the Policy is the same as the definition of the hazard in the *Beretta* policy. However, unlike *Beretta*, the Policy does not exclude coverage for the "products-completed operations" hazard.

Fourth Circuit reasoned that, "regardless of whether the injuries involved could also be said to arise from Beretta's negligent marketing and distribution of its products, the 'but for' cause of the injuries in the Claims arose out of Beretta's product," and therefore Beretta was not entitled to a defense from its insurers. *Id.* at 254.[18]

As *Beretta* explained, Maryland courts construe the phrase "arising out of" to mean no more than "but for" causation. The Maryland Court of Appeals has "rejected proximate cause as a predicate for 'arising out of' coverage." *CSX*, 349 Md. at 316, 708 A.2d at 307. "Arising out of' does not imply sole causation. *EDP Floors*, 311 Md. at 230, 533 A.2d at 688. Instead, Maryland courts give the phrase its "common understanding, namely, to mean originating from, growing out of, flowing from, or the like." *Id.*

In *EDP Floors*, the Maryland Court of Appeals rejected an insured's claim to a defense against allegations of negligent hiring, retention, and supervision. *Id.* at 220, 533 A.2d at 683-84. The insured, EDP, was a flooring company that delivered flooring tiles to a jobsite. *Id.* EDP's employees obtained assistance from "others at the jobsite" to unload the flooring tiles from EDP's truck. *Id.* One of the persons who assisted in unloading was the plaintiff in the underlying tort suit, who was injured during the unloading when an intoxicated EDP employee operated the truck's hydraulic lift, causing the floor tiles to fall onto the tort plaintiff. *Id.* The flooring company's insurance policy contained an exclusion that stated: "'Coverage does not apply to bodily injury or property damage *arising out of* the ownership, maintenance, operation, use, loading or unloading of . . . any automobile . . . operated by a person in the course of his employment by any insured.'" *Id.* at 224-25, 533 A.2d at 686 (emphasis added). In rejecting the

---

[18] The Fourth Circuit affirmed *Beretta U.S.A. Corp. v. Federal Ins. Co.*, 117 F. Supp. 2d 489 (D. Md. 2000) (Blake, J.).

flooring company's claim that the negligent hiring, retention, and supervision claims did not

"arise out of" the unloading of the truck, the court said, *id.* at 230, 533 A.2d at 688-89:

> While these words plainly import a causal relation of some kind, read in context,
> they do not require that the unloading of the truck be the sole "arising out of"
> cause of the injury; they require only that the injury arise out of the unloading of
> the vehicle. Therefore, if [the tort plaintiff's] bodily injury arose out of EDP's
> employee's unloading of the truck, then that injury is excluded from coverage.
> This is so regardless of whether the injury may also be said to have arisen out of
> other causes further back in the sequence of events, such as the employee's
> consumption of alcohol, or the employer's negligent failure to supervise the
> employee.

Similarly, in this case, Ace argues that the Emanuels are not entitled to a defense, because

the only claims against the Emanuels in the Tort Actions are "for damages which *arise from* the

retail purchase/sale of a defective used tire—e.g., but for the retail sale/purchase of the defective

used tire, the damages would not have occurred." Reply at 3 (emphasis in original). In effect,

the Insurer contends that the Endorsement precludes coverage because a used tire was a "but for"

cause of the accident.

To be sure, the Endorsement in this case, like the exclusions in *Beretta* and *EDP Floors*,

includes the words "arising out of." Ace's argument, however, disregards critical differences

between the exclusions in those cases and the language of the Endorsement.

In *Beretta*, the exclusion applied to injury "'arising out of your product.'" *Beretta*, 17 F.

App'x at 252 (quoting policy). In *EDP Floors*, the exclusion applied to injury "'arising out of

the ownership, maintenance, operation, use, loading or unloading of . . . any automobile.'" *EDP

Floors*, 311 Md. at 224-25, 533 A.2d at 686 (quoting policy). Here, if the Endorsement stated

that the Policy did not "apply to bodily injury or property damage arising out of used tires,"

Ace's argument would be well taken. But, that is not what the Endorsement says. The

Endorsement states that insurance coverage does not "apply to 'bodily injury' or 'property

damage' arising out of *the ongoing operations described in the Schedule of this endorsement . . . .*" (Emphasis added.) Then, in turn, it describes the "ongoing operations" as "*operations that consist of retail* used tires." (Emphasis added.) To interpret the Endorsement as Ace urges, one must read the words "operations" and "retail" out of the text.

The meaning of "arising out of" is broad, but it is not limitless. It cannot be construed to render meaningless other terms in the Endorsement because, in interpreting an insurance policy, as with any contract, courts "'must give, if we can, some distinct meaning to every word employed in the contract,'" and a "'construction will not be given to one part of a contract which will annul another part, unless such a result is fairly inescapable.'" *JMP Assocs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 345 Md. 630, 635-36, 693 A.2d 832, 834 (1997) (citation omitted); *see id.* at 632, 646-48, 693 A.2d at 833, 839-40 (holding that independent meaning must be given to the word "on," in insurance policy provision excluding from coverage losses of property left in a vehicle, unless the insured was "in or on" the vehicle at time of loss).

Notably, neither the word "operations" nor the word "retail" is defined in the Policy. As we have seen, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters*, *supra*, 135 Md. App. at 137, 761 A.2d at 1005. BLACK'S LAW DICTIONARY defines "retail" as the "sale of goods or commodities to ultimate consumers, as opposed to the sale for further distribution or processing," and cross-references, by contrast, the definition of "wholesale." BLACK'S LAW DICTIONARY at 1430 (9th ed. 2009).[19] In my view, the BLACK'S definition captures the meaning

---

[19] "Wholesale" is defined as the "sale of goods or commodities usu. to a retailer for resale, and not to the ultimate consumer." BLACK'S LAW DICTIONARY at 1734. Maryland courts often look to dictionary definitions in interpreting insurance contracts. *See, e.g.*, *Pacific Indemnity Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 487 (1985)

that a reasonably prudent layperson would ascribe to the term.  The term "operations," although undefined, is used throughout the Policy, and its usage gives indications as to its meaning.  In particular, the Endorsement states: "This insurance does not apply to 'bodily injury' or 'property damage' arising out of the ongoing operations described in the Schedule of this endorsement, regardless of whether such operations are *conducted by you or on your behalf* or whether the operations are *conducted for yourself or for others*."  (Emphasis added.)

As mentioned, the Endorsement is a form document entitled "Exclusion — Designated Ongoing Operations" and denominated "CG 21 53 01 96."[20]  The cases interpreting the CGL Form are legion, but the Court has located only a single case interpreting the language found in the form exclusion for "Designated Ongoing Operations."  It is an unreported federal district court decision that neither side has cited: *West Bend Mut. Ins. Co. v. American Legion, Dept. of Minn.*, Civ. No. 03887 (RHK/AJB), 2003 WL 22881560 (D. Minn. Dec. 1, 2003).

In *West Bend*, a drunk driver caused a fatal automobile accident.  *Id.* at *1.  Before the accident, a liquor store owned in part by American Legion Post 184 sold alcohol to the driver.  *Id.*  The victim's survivors sued "American Legion Minnesota," alleging that the sale of alcohol to the driver was the cause of the accident.  *Id.*  The court explained that the "American Legion organization consists of many independent entities that work cooperatively toward common goals," and that in Minnesota there was one American Legion "department" (*i.e.*, American

---

(stating that, in construing an insurance contract, "we accord words their ordinary and accepted meanings.  The test is what meaning a reasonably prudent layperson would attach to the term.  This Court has consulted *Webster's Dictionary*, *Random House Dictionary*, or, less often, *Black's Law Dictionary*.").

[20] In particular, the operative language of the exclusion, which states "[t]his insurance does not apply to 'bodily injury' or 'property damage' arising out of the ongoing operations described in the Schedule of this endorsement," is form language.  The description of the particular ongoing operations that are excluded ("any and all operations that consist of retail used tires to include personal injury and medical payments") was added to the form.

Legion Minnesota) as well as "approximately 590 American Legion posts . . . , including Post 184," which were "separate and distinct entities." *Id.* American Legion Minnesota, which had "no control over the day-to-day operations or revenue-producing activities of the individual posts," sought a defense from its insurer, West Bend. *Id.* But, West Bend denied coverage on the basis of the "Designated Ongoing Operations" endorsement, which used the same form language as the Endorsement here. *Id.* In American Legion Minnesota's policy, the "ongoing operations described in the schedule of this Endorsement" were "ALL AMERICAN LEGION POSTS AND DISTRICTS." *Id.* at *2.

The district court granted summary judgment to West Bend, ruling that, on the basis of the "Designated Ongoing Operations" endorsement, it had no duty to defend the lawsuit. *Id.* at *3. In the *West Bend* Court's view, the endorsement unambiguously provided that "the activities of Post 184—including its part ownership of a liquor store—are excluded from coverage." *Id.* at *2. The court reasoned: "The clause excludes coverage for American Legion Posts and Districts '*regardless* of whether such operations are conducted by you or on your behalf.'" *Id.* (quoting policy; emphasis added in *West Bend*). Thus, the court opined that "the clause plainly excludes coverage for the activities of American Legion posts and districts without regard to whether the activity is conducted by or on the behalf of American Legion Minnesota." *Id.*

To be sure, *West Bend* supports Ace's interpretation of the policy. In my view, however, *West Bend* overlooks an inherent ambiguity in the phrase "regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or others." The phrase could mean, as the *West Bend* Court would have it, that it does not matter who conducts the operations. Alternatively, the phrase could mean that the designated operations include operations the insured conducts on its own behalf, operations conducted by

others on behalf of the insured, and operations conducted by the insured on someone else's behalf—but not operations that are conducted neither by nor on behalf of the insured.[21]

Under the latter, alternative construction of the Endorsement, to be disqualified from coverage, a claim must not merely "arise out of" a "used tire," or even "arise out of" a used tire that happened, at some point, to be sold at "retail." Rather, the Endorsement would apply only to claims "arising out of" a certain kind of "operations" that the insured (or someone on behalf of the insured) conducts. And, the excluded "operations" that the insured conducts must consist of "*retail* used tires." Here, according to the complaint, the operations that the Emanuels conduct consist solely of used tire wholesaling, not used tire retailing.

Some hypothetical examples illustrate the improbable results that would flow from Ace's interpretation. For instance, consider Valvoline, another defendant in the Tort Actions, which neither manufactured nor sold the tire at issue, but whose personnel allegedly failed to notice defects in the tire in the course of a routine automotive tune-up on the day of the accident. Valvoline's operations do not consist of the sale of used tires, at retail or otherwise; its alleged liability is premised on negligently performing a tune-up. Assuming that Valvoline were insured under a policy identical to the Emanuels' Policy, then, under Ace's theory, Valvoline would not be entitled to a defense against the negligence allegations, because the accident happened to "arise out of" the failure of a "used tire" that was sold at "retail," but not by Valvoline.

---

[21] Indeed, if the meaning the *West Bend* Court ascribed to the endorsement were unambiguously intended, one might expect the endorsement simply to say "regardless of who conducts the operations."

I do not suggest that *West Bend* was wrongly decided. In *West Bend*, the ambiguity in the endorsement language was easily resolved (and may not even have been apparent), because only one interpretation of the language of the endorsement was plausible in the context of the policy and facts at issue in that case. In the context of the Policy and facts at issue here, however, the Endorsement is inherently ambiguous, resulting in two plausible interpretations.

Or, take Continental, yet another defendant in the Tort Actions, which allegedly designed and manufactured the tire. When Continental originally sold the tire, it was new, not used. And, suppose that when Continental sold the tire, it was not a retail sale; rather, it was injected in the "stream of commerce," and thereafter sold to a tire retailer, who sold it, in turn, as a new tire, to a consumer. Subsequently, the tire was re-sold and, after another journey through the "stream of commerce," was sold at retail, this time as a used tire, by Emanuel Tire Retail. If Continental were insured under a policy identical to the one at issue here, under Ace's interpretation of the Endorsement, Continental would not be entitled to a defense against the manufacturing and design defect claims, because the particular tire that failed had, at some point, been sold at retail by someone else, as a used tire.

For purposes of Ace's Motion, plaintiffs are in essentially the same position as the hypothetical Valvoline and the hypothetical Continental: their "operations" do not consist of the "retail" sale of used tires. Yet, Ace insists that plaintiffs are not entitled to coverage because the accident at issue "arose out of" a "retail used tire" that another entity retailed.[22]

The decision of the Maryland Court of Appeals in *Litz v. State Farm Fire & Casualty Co.*, *supra*, 346 Md. 217, 695 A.2d 566, provides guidance. That case was a declaratory judgment action regarding State Farm's duty to defend its insureds under a homeowner's insurance policy. *Id.* at 220, 695 A2.d at 567. The insureds, Pamela and David Litz, were sued in an underlying negligence action by another couple, the Wrights, who alleged that their minor child was injured while Ms. Litz was providing childcare services at the Litzes' home. *Id.* at 221-22, 695 A.2d at 568. State Farm denied the Litzes coverage on the basis of a "business

---

[22] I am cognizant that an issue appears to lurk in this case as to whether the alleged retailer, Emanuel Tire Retail of Maryland, LLC, is a legally distinct entity, or whether all of the Emanuel entities are, in fact, so closely related that they are functionally a single entity, such that a retail sale by one is a retail sale by all. But, Ace does not advance that theory in its Motion.

pursuits" exclusion in the homeowners' policy, which excluded liability coverage for "'bodily injury . . . arising out of business pursuits of an insured.'"  *Id.* at 221, 695 A.2d at 568.

There was no dispute that Ms. Litz was providing childcare for a fee at the time of the alleged injury and that the business pursuits exclusion therefore applied to her.  *See id.* at 234-35 & n.6, 695 A.2d at 574 & n.6 (stating that "whether the circuit court was correct to conclude that the babysitting in this case constituted a business pursuit" was "not raised on appeal").  The issue that the parties contested was whether her husband was also excluded from coverage.  The undisputed evidence was that Mr. Litz was "rarely at home during the hours that Mrs. Litz cared for" the child, *id.* at 222 n.3, 695 A.2d at 568 n.3, and that he "'was not engaged in any business pursuit out of which this episode arose.'"  *Id.* at 222 n.4, 695 A.2d at 568 n.4 (quoting trial court's finding of fact).  Nevertheless, the trial court ruled that Mr. Litz was excluded from coverage.  *Id.* at 223, 695 at 568.

On appeal, the Maryland Court of Appeals said, *id.* at 227, 695 A.2d at 571:

> We must decide whether the business pursuits of "an" insured were intended to deprive coverage for "all" insureds.  We conclude that the business pursuits exclusion in David and Pamela Litz's homeowner's policy applies separately to each insured such that one insured's excluded activity does not preclude coverage for other insureds who did not participate in the excluded activity.

The Maryland court observed that the Litzes' policy contained "an explicit severability of insurance clause specifying that the insurance was to apply separately to each insured," but also said that, even in the absence of such a clause, "unless the insurance policy provides otherwise, an insurer's obligation 'should be considered several as to each person insured.'"  *Id.* at 229, 695 A.2d at 571-72 (quoting *St. Paul Fire & Marine Insurance Company v. Molloy*, 291 Md. 139, 153, 433 A.2d 1135, 1142 (1981)) (internal citation omitted).  In sum, the court construed the business pursuits exclusion "to mean that the business pursuits of 'an' insured disqualify only

that insured from coverage in the event of property damage or bodily injury resulting from the business pursuit; other insureds, *i.e.*, those not engaging in a business pursuit, remain covered under the policy." *Id.* at 229-30, 695 A.2d at 572. Of import here, although the policy in *Litz* precluded a liability defense for injuries "'arising out of business pursuits of an insured,'" the court determined that only the insured who conducted the business pursuits was excluded from coverage.[23]

Here, the Endorsement excludes from liability coverage injuries "arising out of . . . ongoing operations," which are defined to "consist of retail used tires." The Policy does not unambiguously state that the Endorsement applies without regard to who retails the used tires, nor does it unambiguously exclude coverage for injuries arising out of operations that consist of wholesaling of used tires. Rather, the only operations that are excluded are "retail used tires." Under a tenable interpretation of the Endorsement's language, only the retailing of used tires that constitutes an "operation[]" conducted by or on behalf of the insured is excluded from coverage.

The Emanuels contend that their potential liability in the Tort Actions does not arise out of their operations consisting of retailing of used tires, because their operations consist only of the wholesaling of used tires. I must accept the allegations of plaintiffs' complaint for purposes of Ace's Motion. In my view, the "Designated Ongoing Operations" Endorsement does not unambiguously preclude the potentiality of coverage for plaintiffs in the Tort Actions as a matter

_____

[23] The *Litz* Court also held that the declaratory action should not have resolved whether David Litz was, in fact, involved in the babysitting. *See Litz*, 346 Md. at 233-35; 695 A.2d at 573-75. The court explained that "the issue of whether Mr. Litz participated in the babysitting, regardless of whether it is classified as a business pursuit, is an issue to be resolved in the underlying tort case." *Id.* at 235, 695 A.2d at 574. Relying on its seminal decision in *Brohawn*, *supra*, 276 Md. 396, 347 A.2d 842, the Maryland Court of Appeals stated: "When a question sought to be resolved in the declaratory judgment proceeding would be decided in the pending tort action, . . . it is ordinarily inappropriate to grant a declaratory judgment prior to resolution of the underlying tort trial." *Litz*, 346 Md. at 233, 695 A.2d at 574. In this case, the parties have not addressed the propriety of resolving whether the Emanuels engaged in the wholesale or retail sale of the used tire at issue; I will leave that issue for potential future determination.

of law, and I must permit the introduction of extrinsic evidence to resolve the ambiguity in the Endorsement's language.  Because I cannot conclude at this juncture, as a matter of law, that there is no potentiality of coverage, I shall deny Ace's Motion.[24]

An Order implementing my ruling follows.

Date:   November 23, 2011                                    _____/s/_____
                                                            Ellen Lipton Hollander
                                                            United States District Judge

---

[24] I arrive at this conclusion without reaching the Emanuels' alternative contention, which hinges on the meaning of the phrase "*ongoing* operations."  (Emphasis added.)   Because Ace's Motion can be resolved on narrower grounds, I need not resolve the alternative contention at this time.