IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NORMAN J. EMANUEL, d/b/a
Emanuel Tire Company, *et al.*,

    *Plaintiffs*,

v.

                        Civil Action No. ELH-11-875

ACE AMERICAN INSURANCE
COMPANY,

    *Defendant*.

**MEMORANDUM OPINION**

This Memorandum Opinion resolves plaintiffs' Motion for Partial Summary Judgment (ECF 44), defendant's Cross-Motion for Summary Judgment (ECF 51) (which was presented together with defendant's opposition to plaintiffs' motion), and defendant's Motion for Leave to File Amended Pleading (ECF 45), all of which have been fully briefed. No hearing is necessary to resolve them. *See* Local Rule 105.6. I will grant plaintiff's Motion for Partial Summary Judgment; deny defendant's Cross-Motion for Summary Judgment; and deny, without prejudice, defendant's Motion for Leave to File Amended Pleading. My reasons follow.

**Background**

This is a declaratory judgment action regarding liability insurance coverage. The plaintiffs are Norman J. Emanuel and several business entities that bear his name, all of which are named as insureds under a Commercial General Liability insurance policy issued by ACE American Insurance Company ("ACE"), defendant. The parties dispute whether the insurance policy entitles plaintiffs to a defense and indemnification from ACE in an underlying tort lawsuit

that is pending in the Circuit Court for Baltimore City, Maryland.[1]  The tort lawsuit arises out of a tragic single-vehicle automobile accident involving three fatalities and serious injuries to others, allegedly caused by the sudden tread separation of one of the tires on the vehicle.  The plaintiffs in this declaratory action are purveyors of used tires.  All of the plaintiffs here are defendants in the underlying tort suit.  However, Emanuel Tire Retail of Maryland, LLC ("Emanuel Tire Retail"), the company that allegedly sold the subject tire to the accident victims, is not a plaintiff in this declaratory action, nor is it a named insured under the ACE insurance policy.  However, Emanuel Tire Retail is a closely related entity to the plaintiffs in this declaratory action and is a co-defendant in the underlying tort suit.

The factual and procedural background of this case was set forth in detail in a Memorandum Opinion of November 23, 2011 (ECF 28), in which I denied a motion to dismiss filed by ACE.[2]  The trial in the underlying tort suit is scheduled to commence on July 24, 2012, and resolution of the pending motions in advance of that trial may be helpful to the parties.  Accordingly, in the interest of time, and because the underlying facts, as well as the Maryland law that generally governs a liability insurer's duty to defend, are amply discussed in my earlier Memorandum Opinion, I assume here the reader's familiarity with that opinion.  Moreover, I assume the reader's familiarity with the well honed standards that apply to consideration of motions for summary judgment under Fed. R. Civ. P. 56 and motions for leave to amend pleadings under Fed. R. Civ. P. 15.

---

[1] When this declaratory action was initiated, there were four underlying tort suits: three in the Circuit Court for Baltimore City and one in a Florida state court.  The parties report that the Florida suit has been dismissed and that the three Maryland suits have been consolidated for trial.

[2] The Memorandum Opinion is unreported but is available on Westlaw.  *See Norman J. Emanuel v. ACE American Insurance Co.*, Civ. No. ELH-11-875, 2011 WL 5881793 (D. Md. Nov. 23, 2011).

In their Motion for Partial Summary Judgment, plaintiffs seek a ruling that ACE is obligated to reimburse plaintiffs for their defense in the underlying tort suit and their attorneys' fees and costs in bringing this action, while reserving the issue of whether ACE is obligated to indemnify plaintiffs for any judgment actually obtained against them in the tort suit.   In contrast, in its Cross-Motion for Summary Judgment, ACE seeks a ruling that, as a matter of law, it has no obligation to defend or indemnify the plaintiffs.   Moreover, in the event that this Court were to determine that the insurance policy, as written, provides a potentiality of coverage, ACE seeks in its Motion for Leave to File Amended Pleading to amend its answer to add a counterclaim for equitable reformation of the policy, arguing that the parties did not actually intend to adopt a policy that would cover the types of liability at issue in the tort suit.

As the parties are aware, the legal proposition that undergirds all of the pending motions is that a liability insurer is obligated to defend its insured against a tort lawsuit so long as the "allegations in the tort action *potentially* bring the tort claim within the policy's coverage."   *St. Paul Fire & Marine Ins. v. Pryseski*, 292 Md. 187, 193, 438 A.2d 282, 285 (1981) (emphasis added).   This is a distinct issue from the insurer's obligation to indemnify its insured (*i.e.*, to pay a judgment against the insured), which is triggered only if the insured's established liability is *actually* covered under the policy.   In other words, "the duty to defend depends only upon the facts as alleged" in a tort suit, whereas "the duty to indemnify depends upon liability," and so "the duty to defend is broader than the duty to indemnify."   *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 15, 852 A.2d 98, 106 (2004).

**Discussion**

A.  The CG 2153 Endorsement

The primary issue that was litigated in connection with ACE's earlier motion to dismiss was whether the "CG 2153" endorsement to the policy, which excludes coverage for "designated ongoing operations," bars coverage in the tort suit.  The CG 2153 endorsement states: "This insurance does not apply to 'bodily injury' or 'property damage' *arising out of the ongoing operations* described in the Schedule of this endorsement, *regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others*."  (Emphasis added.)  In turn, the "Schedule" of the CG 2153 endorsement provides the following "Description of Designated Ongoing Operation(s)": "ANY AND ALL OPERATIONS THAT CONSIST OF RETAIL USED TIRES TO INCLUDE PERSONAL INJURY AND MEDICAL PAYMENTS."

In my earlier Memorandum Opinion, I denied ACE's motion to dismiss because I concluded that the language of the CG 2153 endorsement is ambiguous.  Specifically, the ambiguity arises from the phrase, "regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others," which is part of the form language of the CG 2153 endorsement.[3]

The ambiguity is inherent in the "regardless of whether" linguistic construction.  If a friend were to say, "The party will be held tomorrow, regardless of whether it rains," one would understand that "whether" is followed by a silent, implied "or not."  The statement means that

_____

[3] As I explained in my Memorandum Opinion, the CG 2153 endorsement is a form endorsement prepared by the Insurance Services Office, Inc., a provider of policy development services to the insurance industry.  *See* Memorandum Opinion at 9-10 nn.10-11.

the party will go forward, rain or shine—"whether *or not* it rains."  But, ambiguity develops whenever a speaker states that something will occur "regardless of whether" two expressly stated alternatives occur.  For example, if a friend says, "I will go to the party, regardless of whether Joe or Steve asks me," she might mean that she will attend the party with one of two possible companions: Joe or Steve.  But, she might mean, instead, that it does not matter if Joe asks her, if Steve asks her, or if neither of them asks her—she will attend the party in any event.  Because two alternatives are expressly presented, it is ambiguous whether the speaker's use of "regardless of whether" is intended to differentiate between the two expressly presented alternatives or, instead, whether the speaker intends to differentiate between two express possibilities on the one hand, and the silent, implied possibility of "neither" on the other hand.

Ordinarily, context will make the speaker's intention clear and resolve the ambiguity.  In this case, however, where the designated operations in the endorsement are defined as "operations that consist of retail used tires," and coverage is precluded for such operations, "regardless of whether the operations are conducted by [the insured] or on [the insured's] behalf," it is not clear from the text alone whether the endorsement (a) excludes coverage for the retailing of used tires regardless of who retails the tires (which is ACE's position) or, instead, (b) excludes coverage for retailing of used tires conducted either by or on behalf of the insured (it does not matter which), but does *not* exclude coverage for used tires that are retailed neither by nor on behalf of the insured (which is plaintiffs' position).  As I explained in my Memorandum Opinion, the plaintiffs' position seems the more natural meaning in this context.  But, I was not prepared to make that determination as a matter of law, without offering ACE the opportunity to present extrinsic evidence that could resolve the ambiguity.

### B.  Extrinsic Evidence

The parties have now presented ample extrinsic evidence, but none of the evidence directly addresses the ambiguity in the form language of CG 2153.  The parties' extrinsic evidence (which mostly consists of emails, and is of undisputed authenticity) largely concerns changes negotiated in early 2007 to the Emanuel companies' insurance policy with ACE. Negotiation of the policy terms in 2007 was conducted principally between John Doetzer, who was an insurance broker hired by the Emanuel companies,[4] and José Hernandez, a production underwriter with the Willis Program, which sold insurance under the "RecycleGuard" brand name.  The RecycleGuard program was underwritten by ACE, and so Hernandez had extensive discussions with Alice Balsama, ACE's underwriting manager, regarding the terms on which ACE would agree to underwrite a policy for the Emanuels.[5]

The evidence indicates that the parties' intent was to exclude coverage for the retail used tire business conducted by Emanuel Tire Retail, an entity that, as noted, is neither an insured under the ACE policy nor a party to this lawsuit, but is a co-defendant in the underlying tort litigation.  This was because ACE was unwilling to insure that business, and also because Emanuel Tire Retail had obtained a separate "garage policy" to cover Emanuel Tire Retail's

---

[4] The parties dispute whether Doetzer was authorized to bind the Emanuel companies as their agent, or instead merely acted as a broker, negotiating terms preliminarily and conveying the insurer's position to the Emanuel companies for their approval.  I do not find that resolution of this dispute is necessary to my ruling.  I assume, *arguendo*, that Doetzer was authorized to bind the Emanuel companies.

[5] In addition to the emails among Doetzer, Hernandez, Balsama, and a handful of others, the parties have submitted affidavits of Balsama; deposition testimony of Doetzer and Mark Rannie, the Emanuel companies' general manager and vice president; and a few other documents.  None of these additional materials are nearly as salient as the emails that were sent in the course of the negotiation of the policy terms.  Although I have reviewed all of the evidence submitted, I have not specifically mentioned each item of evidence in my discussion.

retail business.   However,  the  parties  intended  to  retain  coverage  for  the  other  Emanuel

companies' used tire wholesaling business under the ACE policy.[6]

Indeed, the evidence suggests that a primary reason for the changes made to the policy in

2007  was  that  previous  iterations  of  the  policy  had  erroneously  contained  a  CG  2153

endorsement stating that "'All coverage is excluded for wholesale used tires operation,'" when

the intent was actually to exclude coverage for the *retail* operation.   *See* Email of January 25,

---

[6] In their complaint, the Emanuel entities that are plaintiffs in this case claim that they do not conduct any retail used tire business; rather, they are only used tire wholesalers.   According to plaintiffs, only Emanuel Tire Retail conducts a tire retailing business.   ACE sought to challenge this factual assertion in the context of its motion to dismiss, submitting as exhibits various web page listings that it contended demonstrate that "Emanuel Tire Company" sells used tires at retail.   *See* ECF 18-1 & 18-2.

I rejected ACE's argument in my Memorandum Opinion, because the exhibits that ACE submitted constituted matter outside of the pleadings, which was inappropriate for consideration in the context of a motion to dismiss.   *See* Memorandum Opinion at 18 n.14.   For purposes of the motion to dismiss, I "accept[ed] as true the Emanuels' allegations in their declaratory complaint that they 'do not perform any operations that consist of "retail used tires,"'" and "assume[d] that the Emanuels deal only in wholesale used tires, not retail used tires."   *Id.* at 22 (quoting complaint) (internal citation omitted).

In a footnote in its Cross-Motion for Summary Judgment, *see* ECF 51 at 2 n.2, ACE renews this argument, stating: "Plaintiff Emanuel Tire Company's own website indicates, under a section titled 'Used Tire Sales': '**Retail.   Visit our retail used tire warehouse at our Baltimore location.**'"   In support of this claim, ACE cites the same exhibits it previously submitted in connection with its motion to dismiss.   According to ACE, whether plaintiffs engage in the retail sale of used tires is a "disputed issue of fact."   *Id.*

I again reject this argument at the summary judgment stage, albeit for a different reason. Even if ACE is entitled to attempt to make such a showing by extrinsic evidence (and, as I explained in my Memorandum Opinion at 16-17, Maryland law significantly constrains an insurer's ability to rely on extrinsic evidence to disprove a potentiality of coverage), the unauthenticated exhibits submitted by ACE could show, at most, that plaintiffs engage in retail used tire sales.   It would not, however, demonstrate that plaintiffs do not engage in wholesale sales of used tires, or that plaintiffs sold the used tire at issue in the tort lawsuit directly to the decedents in a retail transaction.   Because the allegations in the tort suit involve potential wholesaler liability (as I explained in my Memorandum Opinion at 22) ACE would have to establish that plaintiffs do not engage in wholesale transactions, not merely establish that they do engage in retail transactions, in order to eliminate the potentiality of coverage.

2007 from Hernandez to Balsama, ECF 39-1 at 9-10.   Thus, the parties sought to amend the policy both going forward and retroactively.

On January 25, 2007, Balsama instructed Hernandez to revise the CG 2153 endorsement to exclude the retail business, stating that the "standard wording to be used prior to tailoring the exclusion to the individual risk is: 'Any and all operations that consist of xxxxxxxxxxxxxxxx to include personal injury and medical payments.'"   *See* Email of January 25, 2007 from Balsama to Hernandez, ECF 39-1 at 8-9.   The next day, Hernandez advised Doetzer: "ACE agreed to change CG 2153 wording to read 'Any and all operations that consist of all coverage is excluded for retail used tires operation [sic] to include personal injury and medical payments.'   Please confirm this is acceptable."   *See* Email of January 26, 2007 from Hernandez to Doetzer, ECF 51-1 at 11.   Doetzer responded the same day, confirming the changed language and his understanding that the "only difference is the complete exclusion for coverage P/O [*i.e.*, premises operations] as well as Products/Completed Operations.   The original understanding was a Products/Completed Ops exclusion for the Retail Sale of used Tires."   *See* Email of January 26, 2007 from Doetzer to Hernandez, ECF 51-1 at 11.

On February 6, 2007, Hernandez communicated Doetzer's comments to Balsama and asked: "Would you agree to correct the wording on the expiring policies as well?"   Email of February 6, 2007 from Hernandez to Balsama, ECF 39-1 at 25.   Balsama replied to Hernandez: "[W]hat is the agent [*i.e.*, Doetzer] asking?   Did he replace Prem[ises] Ops/Products for the 2006-07 term?   IF he can provide a complete copy of the [garage] policy 2006-07 covering this operation AND have the insured sign a preliminary copy of the CG2153, I will go back for an exception with both in hand IF that is what he is asking."   Email of February 6, 2007 from

Balsama to Hernandez, ECF 39-1 at 24.  Hernandez responded by email on February 12, 2007,

attaching copies of Emanuel Tire Retail's garage policy for the 2006-07 and 2007-08 policy

terms and stating: "I don't have a signed CG 2153 but it is forthcoming.  I will forward as soon

as I get it."  Email of February 12, 2007 from Hernandez to Balsama, ECF 39-1 at 24.  In late

February 2007, Mark Rannie of the Emanuel companies signed and transmitted to Doetzer, who

forwarded on to Hernandez, two signed CG 2153 endorsements (one for the prior 2006-2007

policy, and the other for the new 2007-2008 policy) containing the language that the parties

agree appears in the policy: "Any and all operations that consist of retail used tires to include

personal injury and medical payments."  ECF 44-2; *see* Rannie Deposition at 120 (ECF 52-11).

In March 2007, however, Balsama instructed Hernandez that, "[a]fter a closer review of

CG2153," she believed that, in order "to effectively close the door on Products coverage as well

as premises operations for this exposure," two endorsements would have to be issued: in addition

to the CG 2153 endorsement excluding coverage for "designated ongoing operations," the policy

would also need to contain a "CG 2133" endorsement, excluding coverage for "designated

products."[7]  *See* Email of March 13, 2007 from Balsama to Hernandez, ECF 39-1 at 23.

---

[7] A blank copy of the so-called "CG 2133" endorsement has been submitted as ECF 44-4.
Like the other policy forms in this litigation, CG 2133 is a form endorsement prepared by the
Insurance Services Office.  Its full designation is "CG 21 33 11 85."

The CG 2133 endorsement states: "This insurance does not apply to 'bodily injury' or
'property damage' included in the 'products-completed operations hazard' and arising out of any
of 'your products' shown in the Schedule."  Because, as I shall explain, a CG 2133 endorsement
was never actually prepared and included in the policy, the record does not indicate what
language would have been used in the endorsement's "Schedule" section to designate the
specific "products" that would be excluded from coverage by the endorsement.

As I observed in my Memorandum Opinion at 11 (quoting policy) (internal citations
omitted):

The Policy defines the "products-completed operations hazard" to include, with

Hernandez communicated this position to Doetzer and his colleague, Mary Zimmerman, in an email the same week, but Hernandez also stated that the operations excluded under CG 2153 should be defined as "'Any and all operations that consist of retail, *and/or wholesale* tire sale and/or repair to include personal injury and medical payments.'"  *See* Email of March 19, 2007 from Hernandez to Zimmerman and Doetzer, ECF 39-1 at 35 (emphasis added).  Apparently, Hernandez thereby reintroduced one of the problems that the entire negotiation had been intended to resolve: the unintentional exclusion of coverage for the Emanuel companies' wholesale operations.

Doetzer responded on April 3, 2007, stating:

> [T]he original intent, in May 2006, was to exclude from coverage the Product Liability for the Retail Sale of Used Tires.  The policy was issued with a full exclusion, P/O [*i.e.*, premises operations] and Products/Completed Ops, for the Retail and Wholesale Sale of Used Tires.  We did place a Garage policy for Emanuel Tire Retail of Maryland LLC, that covers the P/O and Completed Operations exposure for the retail sale/installation of used tires, annual revenue @ $600,000 from the Maryland location only.  We still need to cover the Wholesale sale of Tires most of which are shipped out of the country to South America.  In order to accomplish this we can exclude Emanuel Tire Retail of Maryland LLC from the Named Insured List and/or use the Designated Operations exclusion for the Retail Sale of Used Tires.  Whichever way you prefer would be fine with us.

Email of April 3, 2007 from Doetzer to Hernandez, ECF 39-1 at 33-34.

On April 19, 2007, Doetzer reiterated his concerns to Hernandez, stating:

> The wording on the following endorsements needs to be amended per the original agreement (5/06) to exclude from coverage the *Retail* Sale of New and Used Tires.  Please have ACE review this revision and confirm that the expiring policy as well as the current years policy will reflect this change.

---

exceptions not relevant here, "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"  In turn, "your product" includes "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the insured . . . .

1. CG 21 33 Designated Products Exclusion
2. CG 21 53 Designated On Going Operations Exclusion with the wording "Any and all operations that consist of retail sale or repair to include personal injury and medical payments."

Email of April 19, 2007 from Doetzer to Hernandez, ECF 51-1 at 28 (emphasis in original).

Apparently, the negotiations regarding the proper wording were delaying completion of a premium audit of Emanuel's coverage under the prior year's policy. In the same email, Doetzer also stated:

> [I]f ACE is not in agreement with the above wording, then the Audit will need to be revised to exclude the exposure basis for the Whole Sale [sic] of Tires. Please advise your accounting department that we are waiting for the confirmation of coverage for the Wholesale Sale of Tires before we can remit payment for the 06-07 Audit. Once we receive the confirmation that coverage for Wholesale sale of tires existed for the 06-07 policy period Emanuel Tire will promptly remit the additional premium of $1,141.

Later that day, Hernandez communicated Doetzer's position to Balsama. *See* Email of April 19, 2007 from Hernandez to Balsama, ECF 39-1 at 22.

The parties have not submitted any subsequent communications between Balsama and Hernandez. According to Doetzer, he and the Emanuel companies "never got confirmation from ACE" until five months later, in October 2007. Doetzer Deposition at 183 (ECF 52-10). On October 14, 2007, Hernandez wrote to Doetzer: "We finally received approval from ACE. We will amend both years based on our agreement. Note, all retail operations will be excluded." *See* Email of October 14, 2007 from Hernandez to Doetzer, ECF 51-1 at 29. On October 23, 2007, RecycleGuard transmitted to Doetzer a "Declarations Update Endorsement" stating, in relevant part: "As respects to Form CG 2153 – Exclusion Designation [sic] Ongoing Operations, amend as follows: Any and all operations that consist of retail used tires to include personal injury and medical payments." ECF 51-5 at 2. This is the language that the parties agree appears in the

policy.  Moreover, the parties agree that the policy, as issued, does not contain a CG 2133 endorsement excluding coverage for "designated products," despite Balsama's earlier insistence that a CG 2133 endorsement was necessary, in addition to the CG 2153 endorsement, and despite Doetzer's apparent agreement to inclusion of the CG 2133 endorsement.

As I mentioned, none of the foregoing evidence bears directly on the ambiguity as to the meaning of the CG 2153 endorsement's form language, which I previously discussed in my Memorandum Opinion.  Rather, the evidence addresses the parties' intent in utilizing the CG 2153 endorsement.  However, the extrinsic evidence at least makes clear that the parties did not intend to exclude coverage for the Emanuel companies' tire wholesaling business.  To the contrary, they intended to secure coverage for that business.  Moreover, because no extrinsic evidence sheds further light on the ambiguous form language of the CG 2153 endorsement, that language must be construed in favor of the insureds.  Under Maryland law, "when a term in an insurance policy is found to be ambiguous," and extrinsic evidence does not resolve the ambiguity, "the court will construe that term against the drafter of the contract which is usually the insurer." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 280, 825 A.2d 995, 1005-06 (2003); *accord Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459-60, 889 A.2d 387, 394 (2006).[8]  Therefore, I determine, as a matter of law, that the CG 2153 endorsement does not exclude coverage for damages arising from a *wholesale* sale of a used tire by the insured, even if the tire is later re-sold by a third party at retail.  It excludes from coverage

---

[8] As I observed in my Memorandum Opinion, the ambiguous form language at issue was drafted by the Insurance Services Office.  *See* Memorandum Opinion at 9-10 nn.10-11.  As I also observed, "improbable results" flow from ACE's interpretation.  *Id.* at 29.

only designated operations that are conducted by or on behalf of the insured.  Here, the parties designated "operations that consist of retail used tires."

Accordingly, because the allegations of the complaint in the underlying tort lawsuit include claims of liability that could be based on a wholesale sale of the used tire at issue, the CG 2153 endorsement does not preclude the potentiality of coverage in the tort lawsuit.

I pause to note that it remains unnecessary for me to decide whether, as plaintiffs argue, the CG 2153 endorsement governs only "premises/ongoing operations" liability, as opposed to liability for "products/completed operations," *i.e.*, liability for products after they leave the insured's premises.  To be sure, the extrinsic evidence—in particular, Balsama's insistence that issuance of a CG 2133 endorsement was necessary to exclude coverage for "products/completed operations" liability—is persuasive evidence that plaintiffs are correct.  However, that determination is not necessary to my conclusion.  Even if the CG 2153 endorsement can be construed as excluding coverage for products liability arising out of "retail used tires" themselves (*i.e.*, as products, distinct from acts or omissions on the premises of the Emanuel companies' retail used tire sales operation), the endorsement cannot preclude coverage for used tires that are not retailed by or on behalf of an insured.  The policy expressly *includes* coverage for bodily injury and property damage liability within the "products/completed operations hazard," up to an aggregate limit of $2 million  *See* ECF 15 at 7; *see also id.* at 30 (Section III.3 of the CGL Form).  The parties plainly did not intend to exclude coverage for all products of the plaintiffs.  On this record, at most, the CG 2153 endorsement can be read as excluding coverage for used tires that the insureds (or someone else on their behalf) sold at retail.

### C.  Motion for Leave to File Amended Pleading

In ACE's Motion for Leave to File Amended Pleading, ACE requests leave to seek equitable reformation of the policy so as to exclude coverage for products liability.  In essence, ACE seeks to incorporate, by way of contract reformation, the CG 2133 endorsement that may have been erroneously omitted from the policy.

Equitable reformation is a remedy rarely obtained in Maryland.  "Equity will reform a contract where there has been a mutual mistake of fact in the formation of the contract," *Janusz v. Gilliam*, 404 Md. 524, 535-36, 947 A.2d 560, 567 (2008), or where there is a showing of "fraud" or "duress." *Higgins v. Barnes*, 310 Md. 532, 538, 530 A.2d 724, 727 (1987).  "The burden of persuasion upon a party seeking reformation of an instrument is significantly higher than the preponderance standard . . . ." *Id.*  Rather, the "'precise agreement which the parties intended'" must be proved by clear and convincing evidence.  *Id.* at 539, 530 A.2d at 727 (quoting *Moyer v. Title Guarantee Co.*, 227 Md. 499, 504, 177 A.2d 714 (1962)) (some internal quotation marks and citations omitted); *accord Hearn v. Hearn*, 177 Md. App. 525, 539-46, 936 A.2d 400, 408-13 (2007).

Even if the parties intended to preclude coverage of products liability for the Emanuel companies' retail tire sales business (which seems reasonably clear, assuming that Doetzer spoke for the Emanuel companies), a fact finder would be hard pressed to conclude that ACE has proven by clear and convincing evidence the precise terms of the agreement that the parties intended.  In light of the policy's express inclusion of coverage for at least some products liability, and in light of the Emanuel companies' insistence on coverage for their wholesale business, no reasonable fact-finder could conclude, on the evidence presented and under a clear

and convincing standard, that the parties mutually intended to preclude products liability protection for the wholesale sale of used tires.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (holding that "the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits," and that, where governing law "mandates a 'clear and convincing' standard," the motions court must "consider whether a reasonable factfinder could conclude" that the plaintiff has met its burden "with convincing clarity").

Therefore, I will deny ACE's motion for leave to amend its pleading at this time.  Even if ACE is entitled to some degree of reformation of the policy, no reasonable fact finder could conclude that ACE has presented a case for reformation to such a degree as to completely preclude the potentiality of coverage.  Therefore, as to the issue of potentiality of coverage and the duty to defend (as distinct from actual coverage and indemnification), ACE's proposed amendment would be futile.

If the Emanuel companies are found liable at trial in the underlying tort suit, ACE will be free to renew its motion to seek contract reformation, if reformation would be relevant to the issue of indemnity (*i.e.*, if the Emanuel companies' liability would come within the products/completed operations hazard for retail used tires sold by or on behalf of the insureds).

### D.  The CG 2233 Endorsement

If the legal issues were limited to those that the parties presented in litigating ACE's earlier motion to dismiss, my analysis would be at an end.  However, ACE now takes the position that another endorsement, not previously mentioned, precludes coverage.  The endorsement at issue is the so-called "CG 2233" endorsement (ECF 51-2), titled "Exclusion –

Testing or Consulting Errors and Omissions."  It states, in relevant part:

> This insurance does not apply to "bodily injury", "property damages" or "personal and advertising injury" arising out of:
>
> 1.  An error, omission, defect or deficiency in:
>     a.  Any test performed; or
>     b.  An evaluation, a consultation or advice given,[9]
>     by or on behalf of any insured;
>
> 2.  The reporting of or reliance upon any such test, evaluation, consultation or advice; or
>
> 3.  An error, omission, defect or deficiency in experimental data or the insured's interpretation of that data.

ACE contends that the CG 2233 endorsement unambiguously precludes coverage for the allegations of potential wholesaler liability in the underlying tort suit, because those allegations depend on the proposition that the Emanuel companies "'[f]ail[ed] to properly inspect the subject tire'"; "'[n]egligently transferr[ed] the subject tire with defects to Emanuel Tire Retail for sale'"; failed to inform the tort plaintiffs of defects in the tire; or "'[n]egligently inspect[ed], grad[ed], cull[ed], and select[ed] the subject tire from used tires as fit sales to the general public.'"  ECF 51 at 7 (quoting tort complaint).   In ACE's view, these tort allegations "clearly allege bodily injury arising out of the Plaintiffs' defective testing, evaluation, consultation or advice."  ECF 51 at 7.

In contrast, plaintiffs observe that the tort lawsuit includes allegations of strict liability, which by definition does not depend on negligence in testing, evaluation, consultation, or advice. *See* ECF 52 at 13.  Moreover, to the extent that potential liability in the tort suit is based on negligent inspection, grading, culling, or selection of the subject tire as fit for sale, plaintiffs argue that this allegation "arises out of Plaintiffs' standard operations as a used tire wholesaler."

---

9 "Test," "evaluation," "consultation," and "advice" are not defined terms.

*Id.* at 14.  As plaintiffs see it, their "wholesale inventory is derived solely from culling, grading, and selecting re-saleable used tires from those it [sic] collects for recycling."  *Id.*  They argue: "Obtaining coverage for these wholesale activities, which are a fundamental part of its [sic] business, was a critical requirement for Plaintiffs' liability insurance. . . .  In inspecting, culling and grading used tires to select those suitable for resale, Plaintiffs perform in-house activities which are common to many product manufacturers and distributors, which have inspections to cull out products which should not be sold."  *Id.*  According to plaintiffs, it "would be a tortured and unwarranted construction of CG2233 . . . to exclude claims where no test is performed, there is no consultation and no evaluation or advice is given."  *Id.* at 14-15.[10]

In my view, plaintiffs are correct that the strict liability allegations, at least, are not covered by the CG 2233 endorsement and thus create a potentiality of coverage.  Moreover, it is far from clear that the CG 2233 endorsement would preclude coverage for the negligence claims. I shall explain.

As with the other endorsements to the policy, the CG 2233 endorsement is a form endorsement prepared by the Insurance Services Office.  Its full denomination is "CG 22 33 07 98."  There is relatively scant case law interpreting the CG 2233 endorsement or similar insurance policy language.  ACE has cited two cases: *Scottsdale Indemnity Co. v. Hartford Casualty Insurance Co.*, Civ. No. 06-5339, 2008 WL 131105 (E.D. Pa. Jan. 10, 2008), and *American Registry of Pathology v. Ohio Casualty Insurance Co.*, 461 F. Supp. 2d 61 (D.D.C.

---

[10] Plaintiffs also argue that, as part of their activities, "no evaluation, consultation or advice is *given* by or on behalf of Plaintiffs to anyone else."  ECF 52 at 14 (emphasis in original).  I agree with ACE, however, that the CG 2233 endorsement applies, *inter alia*, to "[a]ny test performed," and thus does not necessarily require that test results be communicated or "given" to a third party in order to be applicable.  Similarly, I find plaintiffs' proposed distinction between an "evaluation" and an "inspection" unpersuasive, standing alone.  *See* ECF 52 at 15.

2006).  In addition to those, I have reviewed three other relevant cases: *Davis-Ruiz Corp. v. Mid-Continent Casualty Co.*, 281 F. App'x 267 (5th Cir. 2008); *Hartford Casualty Insurance Co. v. Dental Organization for Conscious Sedation, LLC*, Civ. No. 10-3483, 2011 WL 1315486 (E.D. Pa. April 1, 2011); and *Hartford Casualty Insurance Co. v. New Hope Healthcare, Inc.*, 803 F. Supp. 2d 339 (E.D. Pa. 2011).

In *New Hope*, the court held that the CG 2233 endorsement did not preclude coverage for a nursing home's alleged failure to supervise an elderly resident who wandered from his room and was later found on the grounds of the nursing home with a fractured femur.  *See New Hope*, 803 F. Supp. 2d at 342.  The allegations of negligence against the nursing home included "'Failure to inspect and patrol the premises,'" and failure to train its staff members.  *Id.* at 343 (quoting tort complaint).  The *New Hope* Court held that, under the plain text of the CG 2233 endorsement, these allegations did not "involve errors in testing, evaluating, consulting or advice."  *Id.* at 347.  However, the underlying allegations in this case regarding tire inspection and selection appear closer to the plain meaning of testing or evaluation than the "inspection" and training at issue in *New Hope*.

In *American Registry*, cited by ACE, it was undisputed that a cytotechnologist's allegedly negligent analysis of a Pap smear, which resulted in a delayed diagnosis of cervical cancer, constituted testing, evaluation, consultation, or advice.  *See American Registry*, 461 F. Supp. 2d at 67 ("There seems to be no dispute that the . . . claims are based on bodily injuries arising from an error, omission, defect, or deficiency in tests or consultations.").  The dispute concerning the applicability of the CG 2233 endorsement turned on whether the cytotechnologist was an "insured" and on whether the cytotechnologist's alleged employer, which was the named insured

under the policy at issue, was entitled to coverage for claims of vicarious liability (*i.e.*, respondeat superior) and negligent hiring arising from the cytotechnologist's tort.  The *American Registry* Court held that it did not matter whether the cytotechnologist was an "insured" because she performed the test "on behalf of an insured" (*i.e.*, her alleged employer) within the meaning of the CG 2233 endorsement; therefore, the endorsement precluded coverage for the vicarious liability claim.  *Id.* at 68.  Moreover, coverage for the negligent hiring claim was also precluded, because the damages at issue "'arose out of' [the] failure to perform the cytopathology tests properly."  *Id.* at 70.  While *American Registry* is instructive, the court in that case was not required to determine whether particular activity constituted testing, evaluation, consultation, or advice.

     *Scottsdale*, *Davis-Ruiz*, and *Conscious Sedation* are more closely on point.  In *Scottsdale*, upon which ACE primarily relies, the insured company, SMS, was hired to perform safety inspections at a construction job site.  *Scottsdale*, 2008 WL 131105, at *1.  A construction worker at the site was injured when he fell from a ladder.  *Id.*  He sued SMS, claiming that the ladder was faulty and that SMS had inspected the ladder but failed to find the fault in the days and weeks before the accident.  *Id.*  The *Scottsdale* Court held that coverage was precluded by the CG 2233 endorsement, stating: "Clearly, to the extent that SMS's liability derived from its failure to identify and inform the construction company as to the faulty ladder, this was an 'error, omission, defect or deficiency in' an 'evaluation' or 'consultation.'"  *Id.* at *6.  The court remarked: "There is no ambiguity in the plain meaning of this provision, and the Court will not torture the language to find such an ambiguity."  *Id.*  Moreover, it said: "The evidence is clear

that SMS's only responsibility on the construction site . . . was to perform safety inspections.  It could only have been in this role that SMS was liable."  *Id.* at *7.

ACE reasons that this case is similar to *Scottsdale*, remarking that "here, the Plaintiffs' alleged liability is derived from their failure to properly inspect, test and evaluate the used tire at issue and their failure to inform the underlying plaintiffs in the Tort Actions that the tire was not fit for use on the vehicle."  ECF 51 at 9.  Seeking to distinguish *Scottsdale*, however, plaintiffs insist that the "only basis for SMS' liability was its error, omission or deficiency in its safety inspections of the work site.  The responsibilities and operations of SMS included giving advice about safety issues to the contractor or owner of the job site."  ECF 52 at 15 n.4.  As plaintiffs see it, "[t]his is far different tha[n] the alleged failure of Plaintiffs to inspect, cull, grade and select used tires to sell or transfer at wholesale."  *Id.*

Plaintiffs' proposed distinction finds some support in *Davis-Ruiz*, *supra*, 281 F. App'x 267, an unreported decision of the Fifth Circuit that neither side has cited.  The underlying facts in *Davis-Ruiz* were almost identical to those in *Scottsdale*: a construction site inspection company was sued for alleged failure properly to inspect a storage tank and ladder, which the inspection company had listed as "'acceptable'" in its inspection report, but which broke while a worker was standing on it, causing him to fall and sustain injuries.  *Id.* at 268-69 (quoting report).  However, unlike the *Scottsdale* Court, the *Davis-Ruiz* Court held that the CG 2233 endorsement did not preclude the potentiality of coverage for these allegations (reversing a contrary decision by the district court).

The policy at issue in *Davis-Ruiz* contained, in addition to the CG 2233 endorsement, another endorsement that expressly *provided* coverage for designated "professional services,"

which were described as "'Testing & Consulting.'"  *Id.* at 273 (quoting policy).  The Fifth

Circuit recognized that, under "at least some definitions" of the terms "test," "evaluation," or

"consultation," the CG 2233 endorsement "might be interpreted to encompass the visual

inspection of the storage tank and ladder."  But, in the court's view, such a "broad reading" of

CG 2233, which would "encompass[ ] all testing and consulting," was "impossible to reconcile

with the rest of the policy," including the express coverage for the "professional services" of

"Testing & Consulting."  *Id.* at 274.  The *Davis-Ruiz* Court said: "[I]f we construed [CG 2233] as

barring coverage of claims based on any 'testing' or 'consulting,' the Professional Liability

endorsement would have no effect whatsoever, and the coverage it purports to extend would be

illusory."  *Id.*  As a "reasonable way of giving effect to both [CG 2233] and the Professional

Liability endorsement," the *Davis-Ruiz* Court "read the [CG 2233] exclusion as applying only to

those testing and consulting services that do not rise to the level of 'professional' testing and

consulting services."  *Id.*

    To be sure, the narrow reading of the CG 2233 endorsement adopted in *Davis-Ruiz* was

necessary to make sense of a policy that would otherwise have been internally inconsistent on its

face.  It might stretch *Davis-Ruiz* too far to hold that the exclusionary force of the CG 2233

endorsement is always limited to "professional" testing, consulting, evaluation, and advice.

However, the particular circumstances of the policy at issue in this case are not so far removed

from the circumstances in *Davis-Ruiz*.  Here, as the extrinsic evidence presented by the parties

makes abundantly clear, the parties intended that the policy would provide coverage for the

Emanuel companies' tire wholesaling business.  As plaintiffs point out, inspection and selection

of merchandise and the exercise of "quality control" is part and parcel of any wholesaling

operation and, indeed, of almost any business involving product sales.  This case is unlike *Scottsdale* or *American Registry*, in which the activity performed by the insured or its employee, which the insured had been specifically hired to perform, clearly constituted testing or evaluation.  In contrast, under the allegations here, any "testing" or "evaluation" conducted by plaintiffs was purely incidental to the operation of their business of tire wholesaling.  In other words, plaintiffs are not tire inspectors; they are tire sellers.

However, it is ultimately unnecessary for me to determine whether CG 2233 precludes coverage for the allegations of negligent inspection in the underlying tort suit, because CG 2233 clearly does not preclude coverage for the strict liability claims.  In this determination, I find support in the *Conscious Sedation* case.  There, DOCS, which marketed and sold to dentists sedation dentistry products such as guides, paperwork, protocols, and manuals (but not actual sedation medication), was sued in tort after a dentist's patient died during a procedure (the dentist was not named as a defendant).  *See Conscious Sedation*, 2011 WL 1315486, at *1.  The tort suit alleged "strict liability of unreasonably dangerous products, protocols, and instructions," and also alleged "negligence in the marketing and sale of [DOCS's] products and protocols to dentists without proper warnings."  *Id.*  DOCS's insurer contended that coverage was barred by the CG 2233 endorsement, because the tort suit "allege[d] that the injury arose from the protocols and guidance that DOCS gave, which in [the insurer's] view [was] dental advice within the meaning contemplated" by the CG 2233 endorsement.  *Id.* at *3.  The court rejected this argument because of the presence of the strict liability claims with respect to DOCS's products. It reasoned: "Products are clearly outside of the language" of the CG 2233 endorsement and,

because the tort suit alleged "at least some claims that fall within the policies' coverage," the insurer was obligated to provide a defense. *Id.*

Here, at the very least, there is a potentiality of coverage for the underlying tort claims of strict liability arising out of a used tire sold by plaintiffs at wholesale. Under Maryland's potentiality rule, if "*any* claims potentially come within the policy coverage, the insurer is obligated to defend *all* claims 'notwithstanding alternative allegations outside the policy's coverage, until such times [sic] . . . that the claims have been limited to ones outside the policy coverage.'" *Utica Mut. Ins. Co. v. Miller*, 130 Md. App. 373, 383, 746 A.2d 935, 940 (emphasis added) (some internal quotation marks omitted) (quoting *Southern Md. Agric. Assoc., Inc. v. Bituminous Cas. Corp.*, 539 F. Supp. 1295, 1299 (D. Md. 1982), in turn quoting *Steyer v. Westvaco Corp.*, 450 F. Supp. 384, 389 (D. Md. 1978)), *cert. denied*, 359 Md. 31, 753 A.2d 3 (2000); *accord Zurich Ins. Co. v. Principal Mut. Ins. Co.*, 134 Md. App. 643, 650, 761 A.2d 344, 348 (2000); *see also* 3 NEW APPLEMAN ON INSURANCE LAW LIBRARY ED. § 17.01 (2012 Supp.) ("Virtually all courts agree that if an action involves both potentially covered and noncovered claims—a so-called 'mixed' action—the insurer must defend the entire action.").

Therefore, "until such time[ ] . . . that the claims have been limited to ones outside the policy coverage," ACE is obligated to provide a defense. *Utica*, 130 Md. App. at 383, 746 A.2d at 940. However, the determination regarding the potentiality of coverage does not mean that ACE necessarily will be obligated to indemnify plaintiffs for any judgment obtained against them in the underlying tort suit. That will depend, first, upon whether plaintiffs are found liable in the tort suit; and second, upon whether the actual liability established in the tort suit (as opposed to the potential liability) comes within the scope of policy coverage. *See, e.g.*, *Penn-*

*America Ins. Co. v. Mapp*, 521 F.3d 290, 296-97 (4th Cir. 2008); *Am. & Foreign Ins. Co. v. Mortus*, 198 F. Supp. 2d 717, 719 (D. Md. 2009).

As a practical matter, it seems unlikely that any finding of liability will be predicated on the wholesaler liability for which there is a clear potentiality of coverage. ACE reports that all of the Emanuel plaintiffs, other than Norman Emanuel, trading as Emanuel Tire Company, have been dismissed from the tort suit (ACE does not report whether Emanuel Tire Retail has also been dismissed from the tort suit). *See* ECF 51 at 2 n.2. As ACE acknowledges, the complaint in the underlying tort suit has not been amended. ACE states: "Although the pleadings in the Tort Actions have not been amended, it was determined in the infancy of the underlying litigation that the tire at issue was in fact not sold by these Plaintiffs, but was instead a pre-existing used tire now alleged to merely have been negligently inspected and rotated to the rear of the vehicle by the Plaintiffs during a retail transaction involving the sale of a different retail used tire." ECF 51 at 3 n.3. If Mr. Emanuel is found liable based on the alleged facts reported by ACE, it seems likely that indemnification will be precluded by the CG 2153 endorsement, which plainly excludes coverage for premises/ongoing operations liability for the Emanuel companies' retail used tire operation.

If the underlying claims already have been limited to ones outside the policy coverage, neither side has made that clear to this Court. Moreover, even if the underlying claims have already been limited to ones outside the policy coverage, it is clear that, at least at the inception of the underlying tort suits, there was a potentiality of coverage. For this reason, ACE is liable to

reimburse plaintiffs for the cost of at least some of their defense, although the Court is not able to determine the amount of ACE's liability at this juncture.[11]

E.  Conclusion

For the foregoing reasons, I will grant plaintiffs' motion for partial summary judgment (ECF 44), and deny ACE's cross-motion for summary judgment (ECF 51).  However, my ruling is without prejudice to further litigation by the parties as to the scope of coverage with respect to indemnity, based on the outcome of the underlying tort suit.  Moreover, ACE's motion for leave to file an amended pleading (ECF 45) will be denied, without prejudice to ACE's right to file a similar motion, if necessary, after the underlying tort suit is resolved.  Finally, I will stay this case pending resolution of the underlying tort suit in Maryland state court.[12]   An Order implementing my rulings follows.


Date:   July 20, 2012                        _____/s/_____
                                             Ellen Lipton Hollander
                                             United States District Judge

_____

[11] Even if ACE is liable for the entirety of plaintiffs' defense, plaintiffs have not provided any records as to attorneys' fees and costs from which to calculate the amount of an award.

[12] The issue of indemnity coverage cannot be resolved until conclusion of the underlying tort suit.  If any party wishes to have the Court resolve the amount of ACE's liability for reimbursement of fees and costs in this action and/or the tort suit before the tort suit concludes, I will entertain a motion to lift the stay for that limited purpose.